UNITED STATES, Appellee

v

WALLACE M. WHEELER, Jr., Airman Third Class,
U. S. Air Force, Appellant

10 USCMA 646, 28 CMR 212

No. 12,868

Decided September 30, 1959

*Lieutenant Colonel Philip J. Williamson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major Lawrence J. Gross* argued the cause for Appellee, United States. With him on the brief were *Colonel John F. Hannigan, Lieutenant Colonel Robert W. Michels,* and *Lieutenant Colonel James R. Thorn.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Charged with the premeditated murder of Felicitas Georg by stabbing her with a knife at Wiesbaden, Germany, on October 20, 1957—a violation of Article 118(1), Uniform Code of Military Justice, 10 USC § 918—accused was brought to trial before a general court-martial at Eglin Air Force Base, Florida. The convening authority, in referring the charge for trial, directed that the case be treated as not capital, and accused, who was represented not only by appointed military defense counsel but in addition by two civilian attorneys, pleaded guilty. We note parenthetically that in view of █ the convening authority's directive, the death penalty otherwise imposable upon conviction for premeditated murder could not be adjudged. Hence, receipt of accused's guilty plea was not improper by reason of Article 45(b), Uniform Code of Military Justice, 10 USC § 845. Cf. United States v McFarlane, 8 USCMA 96, 23 CMR 320.

In addition to the judicial confes-

sion, in accordance with Air Force policy that available evidence be presented notwithstanding an accused's guilty plea, the Government established the identity of the victim; the time of her death in her apartment in Wiesbaden; that she was commonly known as "Doris"; that the cause of death was a stab wound inflicted at the nape of her neck; that she possessed a Dutch gold coin given to her by her father, which she customarily kept in a strong-box in her room together with money and other valuables; and that her room, where her body was found, had been looted. Also, the Government proved through the testimony of a police officer from Pensacola, Florida, that on March 21, 1958, after proper warning, accused voluntarily confessed, signing a sworn written statement wherein he related that while in Wiesbaden awaiting transportation to the Zone of the Interior, he met "Doris," with whom he had become acquainted previously during his tour of duty in Germany, and spent the early morning hours of October 20, 1957, with her in her apartment; that while there he took a

648

switch-blade knife from his pocket, leaned over the bed, and stabbed her in the back of the neck; that Doris collapsed and he then searched her room and rifled a cash box, taking money he found with him when he left; and, finally, that he still had the weapon he used in his room in Washington, D.C. Other evidence disclosed that upon an authorized search of accused's apartment in Washington, D. C., on March 24, 1958, a Dutch gold coin and a switch-blade knife were among the items seized.

Accused was convicted as charged and sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for the term of his natural life. The convening authority approved the findings, but in accordance with a pretrial understanding negotiated for accused by his civilian defense counsel, approved only so much of the sentence as provided for dishonorable discharge, total forfeitures, and confinement at hard labor for twenty years. Thereafter, a board of review in the office of The Judge Advocate General of the Air Force affirmed, and the accused petitioned this Court. We granted review to determine whether accused was subject to court-martial jurisdiction for the offense charged, and that is the sole question before us.

While jurisdiction was not disputed at trial, it is well settled that failure to do so does not operate ▆▆▆▆▆ �as a waiver thereof. As we announced in a unanimous opinion in United States v Garcia, 5 USCMA 88, 17 CMR 88:

"In military law, a failure to contest jurisdiction does not operate to waive a want thereof. In the Manual for Courts-Martial, supra, paragraph 68b(1), it is provided that:

'If the court lacks jurisdiction or if the charges fail to allege any offense under the code the proceedings are a nullity. These objections cannot be waived and may be asserted at any time.'

Subsequently, in paragraph 68b(2), it is made clear that jurisdiction over the person, as well as jurisdiction over the subject matter, may not be the subject of waiver."

See also United States v Dickenson, 6 USCMA 438, 20 CMR 154; United States v Roberts, 7 USCMA 322, 22 CMR 112. Accordingly, we turn to the merits of appellate defense counsel's contention that accused was not subject to court-martial jurisdiction.

The pertinent facts touching on the granted issue were set forth by the board of review, and because they are not in dispute we adopt them as they are hereinafter quoted:

". . . On 4 June 1954, the accused enlisted in the United States Air Force for a period of four years. At the time, he was eighteen years old. On 20 October 1957, the date he allegedly committed the murder charged, he was stationed in Germany awaiting transportation to the United States where he was to be relieved from active duty. On 26 October 1957, in the United States, he was relieved from active duty, transferred to the Air Force Reserve, effective 27 October 1957, in his grade of Airman Third Class and assigned to the ineligible Reserve Section, Continental Air Command, for completion of his military service obligation under the Universal Military Training Act. He was not discharged. Service requirements for reservists are set forth in Title 10, United States Code, section 651, in pertinent part as follows:

'(a) Each male person who becomes a member of an armed force before his twenty-sixth birthday shall serve in the armed forces for a total of eight years, unless he is sooner discharged because of personal hardship under regulations prescribed by the Secretary of Defense. . . .

'(b) Each person covered by subsection (a) who is not a Reserve, and who is qualified, shall, upon his release from active duty, be transferred to a reserve component of his armed force to complete the service required by subsection (a).'

**649**

The accused, who became a member of the Regular Air Force when he enlisted in 1954, was, therefore, upon his release from active duty, transferred to a reserve component in accordance with the foregoing provisions of the law. He was informed of his status by written notice, including the fact that his obligated tour expired on 3 June 1962. He acknowledged in writing that he had read the notice and understood his responsibilities as delineated therein. He was required to furnish his home address and he did so, giving an address in Pensacola, Florida.

"Approximately five months later, on or about 20 March 1958, accused was in Pensacola, Florida. On 21 March 1958, he made the written confession mentioned heretofore. On 26 March 1958, the Secretary of the Air Force forwarded the following letter-directive, through the Air Provost Marshal to the Commander, Eglin Air Force Base:

'1. I have been presented with a signed confession from Wallace M. Wheeler, Jr., which confession fully and completely admits his guilt of the murder of Felicitas Georg, a female German national, at Wiesbaden, Germany on 20 October 1957, and I have also been provided with an extensive investigation by the Office of Special Investigations which corroborates Wheeler's confession and which makes it appear that should he be tried such confession and corroborative evidence would be overwhelming proof of his guilt. Such murder was allegedly committed while Wallace M. Wheeler, Jr. was an Airman Third Class with Service No. 14 529 336, serving in the United States Air Force in Germany.

'2. Murder is an offense against the Uniform Code of Military Justice for which a court-martial may adjudge confinement for five years or more. The said Wallace M. Wheeler, Jr. allegedly committed this offense while in a status in which he was subject to the Code. Since the alleged murder was committed by the said Wallace M. Wheeler, Jr. outside the territorial limits of the United States, he cannot be tried in the courts of the United States or any state or territory thereof or in the District of Columbia Jurisdiction, therefore, under Article 3(a) of the Code has not been terminated by the release from active duty on 26 October 1957 of the said Wallace M. Wheeler, Jr., as on that date he was, without being discharged, assigned to Headquarters Continental Air Command (ISLRS), Air Reserve Records Center, 3800 York Street, Denver 5, Colorado, for the fulfillment of his legal military obligations.

'3. Being satisfied that there is probable cause to believe that the said Wallace M. Wheeler, Jr. has in fact committed the murder alleged pursuant to paragraph 11b, Manual for Courts-Martial, United States, 1951 (Executive Order 10214, February 8, 1951), Article 3(a) of the Uniform Code of Military Justice, as the Secretary of the Air Force I hereby consent to the apprehension, return to military control, and trial by court-martial, by the appropriate Air Force authorities, of the said Wallace M. Wheeler, Jr.

'4. I hereby direct the Air Provost Marshal, United States Air Force, to effect the apprehension of the said Wallace M. Wheeler, Jr. and cause him to be delivered forthwith to the Commander, Eglin Air Force Base, Florida for the purpose of further investigation and trial by court-martial, if thereafter deemed appropriate.'

"Article 3(a) of the Uniform Code, referred to in the letter, provides that court-martial jurisdiction is retained under certain conditions as to persons who have committed an offense while on a status subject to the Uniform Code of Military Justice, after that status has terminated. Paragraph 11b, Manual for Courts-Martial, 1951, also mentioned in the letter, states that jurisdiction under

Article 3(a) should not be exercised without the consent of the Secretary of the Department concerned. Thus, it appears from the directive of the Secretary of the Air Force that on 26 March 1958, in Washington, D. C., he consented to the exercise of jurisdiction over the accused under the said Article 3(a). The Secretary's order was never withdrawn or countermanded.

"On the same day, 26 March 1958, accused, in Florida, made written request for recall to active duty in the Air Force pursuant to the provisions of Air Force Regulation 45-21. At the time, he was a prisoner in the municipal police station in Pensacola. The reenlistment officer from Eglin Air Force Base brought the application form to the accused. The form, when completed and signed by the accused, bore the following statement:

'1 understand if this application is accepted I will immediately be confronted with Court-Martial proceedings arising out of the allegations related to incidents while I was on Active Duty under my Air Force enlistment.'

Still on the same day, 26 March 1958, Special Orders were published ordering accused to extended active duty and assigning him to an organization at Eglin Air Force Base. On that day he was removed from the Pensacola jail to the Eglin Air Force Base Stockade. The following day, 27 March 1958, charges were preferred against him for the murder of Felicitas Georg. On 31 March 1958, an officer was appointed to make formal investigation of the charges as required by Article 32, Uniform Code of Military Justice. Later, trial by general court-martial was recommended. However, on 13 April 1958, accused filed a petition for a writ of habeas corpus with the United States District Court for the Northern District of Florida, claiming that the military authorities had no jurisdiction over his person because (a) he was an inactive reservist and (b) because his recall to active duty was involuntary by reason of fear induced by Government agents that the probability existed he would be extradited to Germany to stand trial for murder, and, in any event, was a nullity because he was recalled to active duty for the express purpose of trial by court-martial, in violation of the Air Force Regulation providing for the voluntary recall of reservists to active duty. On 14 July 1958, the District Court dismissed the petition, holding that because of accused's status and unfulfilled military obligation, jurisdiction over his person under Article 3(a) of the Uniform Code of Military Justice had not terminated.

"On 17 October 1958, the case was referred to trial, and trial was held on 4 November 1958 with the results hereinabove noted." [United States v Wheeler, ACM 15760, January 22, 1959.]

Because the Chief Judge has concurred on separate grounds and Judge Ferguson has disassociated himself from the views herein expressed, the following discussion sets forth only the author Judge's reasons for affirming the findings and sentence.

For reasons which will hereinafter appear, I deem it unnecessary to determine whether or not accused's recall to active duty, at his own request and for the express purpose of standing trial by court-martial, was legal. If jurisdiction exists on one basis, it is immaterial whether there may be other grounds rendering the accused amenable to trial by court-martial. In my view, as both the board of review and Judge DeVane indicated, the basic question in this case is as posed by the latter in his decision on accused's petition for writ of habeas corpus:

". . . whether, after release from active duty in the Air Force to a reserve status, a member of the United States Air Force Reserve, who has an uncompleted military service obligation, is subject to Article 3(a) of the Uniform Code of Military Justice, 10 USC § 803(a), for the purpose of trial by court-martial on a charge of premeditated

**651**

murder of a woman in Germany, committed allegedly by the petitioner while on such active duty and prior to his release therefrom."

Wheeler v Reynolds, 164 F Supp 951 (ND Florida) (1958).

First it should be made clear that accused's inactive reserve status after his separation from active █ duty did not render him subject to trial by court-martial under Article 2(3), Uniform Code of Military Justice, 10 USC § 802. That provision is intended to permit the services to exercise criminal jurisdiction over accused persons who commit offenses while they are on voluntary inactive duty training and their orders specifically make them subject to the Code. Moreover, any thought that former servicemen who have been legally discharged from the service and who have become full-fledged civilians may be tried by military courts should be dispelled by our language in United States v Gallagher, 7 USCMA 506, 508, 22 CMR 296, where we stated:

"The general rule is that court-martial jurisdiction over military personnel subject to the Code is terminated by a discharge from the service which returns the serviceman to the civilian community, and that jurisdiction as to offenses committed during the period of service prior to discharge is not revived by re-entry into the military service. Hirshberg v Cooke, 336 US 210, 69 S Ct 530, 93 L ed 621 (1949); Manual for Courts-Martial, United States, 1951, paragraph 11a, page 14. The theory here appears to be that military persons, and those who serve with, accompany, or are dependent upon them, are subject to military jurisdiction only so long as they remain such, and that when that status is legally terminated they are no more subject to that jurisdiction than is any other member of the civil community."

However, Article 3(a) of the Code, 10 USC § 803, provides as follows:

"(a) Subject to section 843 of this title (article 43), no person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenability to trial by court-martial by reason of the termination of that status."

And while the legislative history of the Code indicates Congress would not permit the application of Article 2 jurisdiction to reservists, except those voluntarily accepting orders to inactive duty training, or those covered by Article 2(6), it is crystal clear that that body had no such compunctions about the scope of Article 3(a). Even the initial draft of that Article applied to reservists, but at the direction of the House Committee, in order to broaden its coverage but limit its application to serious crimes not otherwise punishable, that Article was redrafted and in its revised form, which applies to reservists and others alike, it was enacted into law. Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H.R. 2498, pages 879–884, and 1262, and House Report No. 491, 81st Congress, 1st Session, pages 4, 5, 10, and 11.

At the time of the offense herein involved, accused was on active duty in the Air Force, and hence █ was then subject to trial by court-martial. Article 2(1), Uniform Code of Military Justice, supra. Imposable punishment for the offense, premeditated murder, exceeds "confinement for five years or more," and, since the crime was committed in Germany against a German national, accused cannot be tried therefor "in the courts of the United States or of a State, a Territory, or the District of Columbia." See Article III, Section 2, clause 3, United States Constitution. Also, the statute of limitations, Article 43(a), Uniform Code of Military Justice, 10 USC § 843, does not bar trial

of the offense. Accordingly, Article 2 jurisdiction having existed over accused at the time of the offense, and the other conditions of Article 3(a) having been met, under the terms of the last-mentioned Article, accused was not relieved from amenability to trial by court-martial. Nor does paragraph 11*b*, Manual for Courts-Martial, United States, 1951, operate to defeat exercise of jurisdiction under that Article. That paragraph provides, inter alia:

". . . Jurisdiction under Article 3*a* should not be exercised without the consent of the Secretary of the Department concerned."

but in the case at bar, as noted previously, the Secretary of the Air Force consented to and directed the exercise of jurisdiction under Article 3(a).

Accused, however, contends that he falls within the sweep of Toth v Quarles, 350 US 11, 76 S Ct 1, 100 L ed 8 (1955). Under this facet of his argument he asserts that the Supreme Court has stricken down Article 3(a) as being unconstitutional. I do not construe the holding in *Toth* to go that far, so as to preclude the Air Force from asserting jurisdiction over him. As we stated in United States v Gallagher, supra, at page 510:

"We are well aware that in Toth v Quarles, 350 US 11, 76 S Ct 1, 100 L ed 8 (1955), the Supreme Court held that Article 3(a), in so far as it attempted to authorize the trial by courts-martial of ex-servicemen who are civilians at the time of trial, was unconstitutional, but that holding must be considered in the light of the issues involved. There the accused had severed all of his connections with the military service and had reverted to a civilian status prior to apprehension. Judging by the record, he was out of the Air Force for all purposes."

We must, of course, follow the Supreme Court's holding on the constitutionality of an act of Congress, but we are not precluded from reasonably interpreting the language used when confronted with a different state of facts. In seeking to apply the holding of *Toth* to the case at bar, when I look to the language used I find that Court characterized Toth's status variously as "honorably discharged," "At the time of arrest . . . [without any] relationship of any kind with the military," a civilian ex-soldier "who had severed all relationship with the military and its institutions," and a "civilian ex-soldier who has been wholly separated from the service," and concluded "that Congress cannot subject civilians like Toth to trial by court-martial." (350 US at pages 13, 14, 22, and 23). It is clear that accused Wheeler did not and does not enjoy that same status.

In the case at bar, as we have previously seen, accused was merely separated from active duty. He was not discharged and did not receive a discharge certificate, nor does he contend to the contrary. In fact, since accused had a remaining unfulfilled service obligation under the Universal Military Training and Service Act, 10 USC § 651(a), and was not sooner discharged under the provisions of that subsection, the Air Force was bound by subsection (b) of that statute to transfer him to the reserve upon his release from active duty and he was obligated to serve out his term. Not only does the fact that accused was merely separated from active duty demonstrate he remained in the armed forces, but it is of interest to note that 10 USC § 8811 (a) requires that a discharge certificate be given to Air Force enlisted personnel upon their discharge. That accused received neither discharge nor the certificate supports the conclusion that he remained a member of the Air Force upon his transfer to the reserve. And Air Force Regulation 39-63, October 4, 1956, which supplements the Universal Military Training and Service Act, sheds further light on the matter and distinguishes "release from active duty" from "discharge." It is therein provided:

"1. Definitions. For the purpose

of this regulation the following definitions will apply:

"a. *Release From Active Duty* — the termination of active military service and transfer to the Air Force Reserve.

"b. *Discharge* — complete severance from all military status, as upon expiration of enlistment when the airman does not have any Reserve or service obligation, or under regulations which specifically require complete severance from the service prior to expiration of enlistment, and/or prior to fulfillment of obligation. Discharge includes termination of any reserve status.

. . . . .

"2. Transfer to the Air Force Reserve. . . . airmen who are released from active duty and have a Reserve obligation . . . will not be discharged. They will be transferred to the Air Force Reserve for a period which, when added to the period served on active duty, completes their service obligation."

See also Air Force Regulation 39-10, October 27, 1953, paragraphs 4, 5, and 6, and Air Force Regulation 39-10A, March 21, 1957, paragraphs 7 and 12. In addition, lest there be any question, Congress has spoken and settled the matter. The Air Force is one of the Armed Forces, and the Air Force Reserve is a constituent reserve component thereof. 10 USC §§ 101 and 261 (a). See also 10 USC § 267. There can be no doubt then that accused, as a person released from active duty and transferred to the reserve, remained a member of the armed forces.

Consequently, it should be clear that *Toth*, supra, is not determinative of the case at bar. Accused did not become a "civilian like Toth," nor did he become a civilian ex-soldier "who has severed all relationship with the military and its institutions." To the contrary, accused remained a member of the armed forces.

Before discussing the final point, whether jurisdiction over service obligors such as this accused is necessary to maintain good order and discipline in the services, it should be noted that the Supreme Court in *Toth* mentioned the view of Colonel Winthrop. In his Military Law and Precedents, 2d ed, 1920 Reprint, page 107, he states:

". . . The opinion of the author —that this class of statutes, which in terms or inferentially subject persons formerly in the army, but become finally and legally separated from it, to trial by court-martial, are all necessarily and alike unconstitutional—remains unmodified. In his judgment, *a statute cannot be framed by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace.*"

Conditions in the military and laws of Congress have changed considerably since that time, and the military services now have the right to retain some control over those who join willingly or unwillingly until such time as they have fulfilled their military obligations, and I am certain Colonel Winthrop was referring to "civilians" who had severed completely their relationship with the military. This view is borne out by the holding of the Supreme Court in Kahn v Anderson, 255 US 1, 41 S Ct 224, 65 L ed 469, wherein that Court observed:

". . . But, as the allegations of the petition and the contention based upon them concede that the petitioners were, at the time of the trial and sentence complained of, military prisoners undergoing punishment for previous sentences, we are of opinion that, even if their discharge as soldiers had resulted from the previous sentences which they were serving, it would be here immaterial, since, as they remained military prisoners, they were for that reason subject to military law and trial by court-martial for offenses committed during such imprisonment."

From this quotation, it would appear that, if the services retain some legal control over the person of one who has offended, the rule of *Toth* does not apply.

To hand pick certain phrases from *Toth* which tend to support a finding

654

that Article 3(a) is not unconstitutional as to this accused would be a one-sided approach. When all is said and done, the Supreme Court has the final say on the constitutionality of an act of Congress, and we should give heed to all, not merely part, of the guideposts furnished by it. Certainly, we must consider that Court's opinion by its four corners and when I do, there are some expressions which have a tendency to militate against a holding that military jurisdiction continues over persons who have moved out of the active service. Perhaps the best statement in support of that proposition is this: "Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to *the least possible power adequate to the end proposed.*" (350 US at page 23).

In my view, "adequate to the end proposed" should be interpreted to mean reasonably necessary for the services to carry out their mission to fight a war—limited or atomic—successfully. I believe this case to be within the ambit of that concept. No doubt the accused is one step removed from the man on active duty, but he has not become a full-fledged civilian and his military status is such that he is in fact part and parcel of the armed services. He was trained by the Air Force to be an airman, and Congress has said he must be available for immediate recall to active duty during his obligated duty period. He is part of that body of men who is characterized as ready reserves, and he is subject to serve on active duty almost at the scratch of the Presidential pen, 10 USC § 673. It must be realized that under existing conditions a reservoir of trained individuals who are minutemen must be maintained to augment those on full-time employment. In 10 USC § 262, Congress defined the purpose of the reserve components in the following words:

"The purpose of the reserve components is to provide trained units and qualified persons available for active duty in the armed forces, in time of war or national emergency and at such other times as the national security requires, to fill the needs of the armed forces whenever, during, and after the period needed to procure and train additional units and qualified persons to achieve the planned mobilization, more units and persons are needed than are in the regular components."

Without that force, the military potential of this country would be woefully inadequate to defend against those who might seek to conquer or destroy. To take an opposite view would be to overlook entirely the ever-present threats to present-day existence and the commands of Congress as shown by its enactments. As Judge DeVane pointed out in his decision on accused's habeas corpus action:

". . . While it is true that, both by voluntary enlistment and conscription, the government has, in the past, and can, in the future, in event of war or national emergency, obtain the necessary men and women, who, after training and equipping, will be the soldiers, sailors, and airmen, to provide adequately for the defense of this nation, yet, the procedures for their procurement, their physical and mental examinations and other processing, and the requirements as to their basic and further training, differ greatly from the more summary procedures established by Congress in the operation of the reserve components for recalling to active duty, qualified, available, trained, and obligated reserve personnel."

Wheeler v Reynolds, supra, pages 954, 955.

That under present-day conditions the services must have a ready reserve qualified for immediate duty should be conceded by all. But if my interpretation of the Supreme Court's limitation in *Toth* is correct, we must decide whether, in order to maintain orderly and disciplined fighting forces and to keep them in good public repute, it is necessary that military criminal jurisdiction be retained, over those who have not completed their service obligation, for offenses committed dur-

ing the time they were performing the active part of their required service. I believe it is. Certainly one under a charge of committing a serious offense is hardly qualified for duty, and so far as impairment of discipline, order and repute is concerned, I see little difference on the adverse impact between offenses committed by the man who serves his eight years actively and those perpetrated by one who serves two years in that status and six years in a reserve capacity, provided they occur while the latter is on active duty. If either offends, to be prosecuted the crime must be committed while the offender is in all respects a member of the military community and subject to military control under Article 2 of the Code, supra. Those with whom either serves and the civilian population where each is on duty may be affected by any misbehavior. Both are identified as belonging to a particular American service, and it is brought into disrepute by the lawlessness. Punishment serves to deter criminality, and the services should not be impotent to protect their good name by being denied the right to punish all those who by criminal conduct offend in foreign lands. Not only do unpunished criminals bring them into disrepute and lower the prestige of the Nation, they impair morale and discipline in the services. In cases similar to the one at bar, unless those who commit murder can be tried by the military, they become immunized from prosecution for dastardly crimes committed against foreign nationals. But equally important, they end up with a military record which can be clouded with nothing more than an administrative discharge. No confinement may be adjudged, and that type of action is hardly adequate for crimes carrying a death penalty. In addition, should this not be accomplished prior to the declaration of an emergency, they could be swept back into active duty to serve alongside their brothers-in-arms, merely because they were able to conceal their crime until after they were moved from an active to a reserve status. It thus appears to me that a serviceman could steal from his bud-

dies, escape prosecution by being transferred to the reserve, and subsequently join them as a fellow-in-arms. Moreover, admitted murderers, felons and rapists could be foisted on the services and their only remedy to correct the situation would be an administrative discharge, which is an inadequate deterrent, either to prevent discredit to the armed forces or to maintain good order and discipline in the services. Fortuitous circumstances which prevent the crime of an accused from being detected until he wears a uniform only part time should not bar his conviction if he is in fact guilty. It is to be remembered that we are not dealing with minor offenses for if prosecution is permitted, in addition to other limitations, the crime must be of a heinous nature and one that cannot be tried in a Federal or State court. Commission of offenses thus hemmed in would indicate the perpetrator was of a caliber which would make him unwanted in both the military and civilian community. Permitting that class of person to roam throughout the service would breed disrespect for law and order, and that could not help but have a measurably adverse impact on morale, discipline, good order, and repute. I, therefore, believe that the Supreme Court did not intend to strike down the power of Congress to give military authorities the power to punish this limited class of individuals, for such authority is necessary and proper to permit them to maintain an orderly, disciplined, and respected fighting force.

Hence I conclude Article 3(a) of the Code, supra, is not unconstitutional as applied to this accused and, therefore, the court-martial had jurisdiction to try and convict him for the crime alleged.

And I point out that I am not constrained one whit in this conclusion by any language appearing in United States v Blue, 3 USCMA 550, 13 CMR 106; United States v Speller, 8 USCMA 363, 24 CMR 173; or United States v Robertson, 8 USCMA 421, 24 CMR 231. As the board of review clearly pointed out, none of those cases have any pertinency to the in-

stant appeal, for the factors making Article 3(a) applicable here are not present in any of them.

Some argument is advanced that my holding will open up a Pandora box and all reserve personnel will be brought within the jurisdiction of military courts. Those claims are extravagant and have no foundation in fact or fancy. Any fair reading of this opinion should convince even the most severe critic that the contention is devoid of merit. In the first place, before jurisdiction under Article 3(a) may be exercised, the offense must have been committed while the offender was amenable to trial by court-martial under Article 2 of the Code, supra. Also, the crime must be such that it carries a penalty of five years or more and cannot be tried in a Federal or State court. The statute of limitations applies, and for most crimes that period does not exceed three years. A complete discharge from the service bars trial. There must be an obligation to serve for a statutory period. And consent of the Secretary of the Department concerned should be obtained before exercising jurisdiction under Article 3(a). Moreover, it should be noted that if a discharge from the service is effectuated and a reserve obligation assumed, the person involved does not again become subject to Article 2 unless he is ordered into Federal service because an emergency arises or war is declared or he voluntarily accepts orders which make him subject to the Code, and then he cannot be tried for offenses except those committed while on active duty. With those exceptions in mind, members of the reserve forces need have no fear of being hailed before military courts unless they commit a serious crime while subject to Article 2, they have not been legally discharged from the service, the offense is such that it cannot be prosecuted in American courts, the statute of limitations has not run, and they have not fulfilled their fixed statutory obligation to serve prior to trial. That situation would not confront many reserve personnel but, if it does, they must realize that Congress not only included them, it intended to make all persons committing offenses on active duty subject to trial by military courts with fewer limitations than those herein indicated. If my interpretation of the law is broad, it is only because I believe it echoes the words of Congress as limited by the Supreme Court.

Accordingly, accused's assignment of error is resolved against him, and the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring):

Here, the accused was subject to military law at the time the offense was committed. Thereafter, he was released from active duty and transferred to the Air Force Reserve. When his complicity in the offense was established, he initiated his recall to active duty with a written request for such action. Although he contested the voluntariness of this action before the District Court for the Northern District of Florida, the issue was not decided by that tribunal. Its decision was predicated entirely upon the accused's amenability to trial under the provisions of Article 3(a) of the Uniform Code of Military Justice, 10 USC § 803.

When the case came on for trial before the general court-martial convened at Eglin Air Force Base, Florida, the accused, represented by competent counsel of his own choice, did not raise an issue of the voluntariness of his request for recall. Rather, he entered into a stipulation respecting the facts upon which jurisdiction was claimed. This stipulation adverts to his active duty tour, his relief from active duty and transfer to the reserve, and closes with these significant recitations of fact:

"On 26 March 1958 the accused executed an application for extended active duty with the United States Air Force (AF Form 125); which form states that the application was made under the provisions of AFR 45–21 and which form contains the following legend in the remarks section: 'I

understand if this application is accepted I will immediately be confronted with court-martial proceedings arising out of the allegations related to incidents while I was on active duty under my Air Force enlistment.' By Direction of the Secretary of the Air Force the accused was relieved from Reserve Assignment Headquarters ConAC (ISLRS) Air Reserve Records Center, Denver 5, Colorado, and assigned to Headquarters, Air Proving Ground Center, Eglin Air Force Base, Florida, effective 26 March 1958 by Special Orders Number A–1232 dated 26 March 1958 for a period of 48 months unless sooner relieved."

Nowhere is mention made of involuntariness of the accused's request for recall. Indeed, a logical inference may be drawn from the recitation of facts that the request was not occasioned by unlawful coercion, fraud or other conditions of involuntariness. Having passed over this item before the trial court—"the only satisfactory forum for conducting truly adversary proceedings, and for testing the validity of evidence in the time-honored process of cross-examination"[1]—he attempted to inject it into the proceedings before the board of review; but before this Court, again no question of voluntariness is raised.

From the foregoing it appears certain that this record affirmatively and incontestably establishes that the accused's return to an active duty status is not affected by any taint of involuntariness. This leads me to conclude that no issue relative to a recall for purposes of court-martial only is presented for our decision. Such an issue could arise only if the recall was without the accused's consent.

Thus, the crime was committed, and the trial was held, when the accused was subject to military ██ law. In legal effect, therefore, this situation is precisely the same as was found in United States v Gallagher, 7 USCMA 506, 22 CMR 296, where we held that a dis-

charged serviceman who re-enlists, may, subject to the statute of limitations, be tried for the type of offense defined in Article 3(a) and committed in a prior enlistment. There, the accused had a discharge from the former enlistment. Here, his tour of active duty was terminated by an order which transferred him to the Air Force Reserve. In both instances, his amenability to military law came to an end, momentarily at least. What I observed in *Gallagher,* supra, is equally pertinent here:

"One who re-enlists in the service after a discharge is not 'like Toth.' On the contrary, his position is like that of a person who leaves the country after committing a crime. During the time he is outside the jurisdiction he cannot be tried. But if he returns, he can, subject to the Statute of Limitations, be tried and convicted for an offense committed by him before his departure. From that point of view, the time hiatus between discharge and re-enlistment is completely immaterial." [See also United States v Martin, 10 USCMA 636, 28 CMR 202.]

I therefore join in the action affirming the decision of the board of review. I express no opinion as to the continuation of court-martial jurisdiction under Article 3(a) of the Code over individuals relieved from active duty and transferred to a reserve component for completion of a military service obligation under the Universal Military Training Act. That question must await determination in a case in which the factual situation presents it.

FERGUSON, Judge (concurring in the result):

I concur in the result.

As the accused was on active duty at the time he committed the offense with which he was charged ██ and had voluntarily returned to active duty at the time of his trial, jurisdiction existed to try him by court-martial for the murder of Felicitas Georg in Wiesbaden, Germany, a crime punishable by

---

[1] United States v Brown, 10 USCMA 498, 503, 28 CMR 64.

confinement for five years or more and not triable in a United States District Court. Uniform Code of Military Justice, Article 3(a), 10 USC § 803; United States v Gallagher, 7 USCMA 506, 22 CMR 296.

I completely disassociate myself from the conclusion of the principal opinion that Code, supra, Article 3(a), may be constitutionally utilized as the basis for the exercise of jurisdiction over a member of the reserve forces not on active duty for an offense committed while he was on active duty. I deem Toth v Quarles, 350 US 11, 76 S Ct 1, 100 L ed 8 (1955), as well as our language in United States v Blue, 3 USCMA 550, 13 CMR 106, and United States v Speller, 8 USCMA 363, 24 CMR 173, to be dispositive of Judge Latimer's contention. Accordingly, I am able to join only in the result which he reaches.