UNITED STATES, Appellee

v.

Michael B. GILBREATH, Corporal
U.S. Marine Corps, Appellant

No. 14-0322

Crim. App. No. 201200427

United States Court of Appeals for the Armed Forces

Argued October 15, 2014

Decided December 18, 2014

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN, STUCKY, RYAN, and OHLSON, JJ., joined.

Counsel

For Appellant:  Major John J. Stephens, USMC (argued);
Lieutenant Jared A. Hernandez, JAGC, USN.

For Appellee:  Lieutenant Ian D. MacLean, JAGC, USN (argued);
Colonel Mark K. Jamison, USMC, and Brian K. Keller, Esq. (on
brief); Colonel Stephen C. Newman, USMC, and Major Tracey L.
Holtshirley, USMC.


Military Judge:  Stephen F. Keane

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Gilbreath, No. 14-0322/MC

Chief Judge BAKER delivered the opinion of the Court.

Contrary to his plea, a general court-martial composed of officer and enlisted members convicted Appellant of larceny in violation of Article 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921 (2012). He was sentenced to a bad-conduct discharge, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged, and the United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed. United States v. Gilbreath, No. NMCCA 201200427, 2013 CCA LEXIS 954, at *12, 2013 WL 5978034 at *4 (N-M. Ct. Crim. App. Nov. 12, 2013).[1] On Appellant's petition, we granted review of the following issue:

> WHETHER INDIVIDUAL READY RESERVISTS, SUBJECT TO PUNISHMENT UNDER THE UCMJ, ARE ENTITLED TO THE PROTECTIONS OF ARTICLE 31(b) WHEN QUESTIONED BY SENIOR SERVICE MEMBERS ABOUT SUSPECTED MISCONDUCT COMMITTED ON ACTIVE DUTY.

We also specified for review a second issue:

> WHETHER THE MILITARY JUDGE ERRED IN CONCLUDING THAT APPELLANT'S STATEMENTS WERE ADMISSIBLE UNDER ARTICLE 31(b), UCMJ, AND MILITARY RULE OF EVIDENCE 305.

---

[1] We heard oral argument in this case aboard United States Marine Corps Base Camp Lejeune, North Carolina, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

<u>United States v. Gilbreath</u>, No. 14-0322/MC

Appellant was serving in the Individual Ready Reserve (IRR) at the time he was questioned by Sergeant (Sgt) Nicholas Muratori regarding a pistol missing from the unit armory. Appellant did not receive Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), warnings.  The questions presented in this case are:  Does Article 31(b), UCMJ, apply in the case of an active duty military questioner interacting with a member of the IRR? If so, were Article 31(b), UCMJ, warnings required in the context presented in this case?  The Government contends that Article 31(b), UCMJ, cannot apply to the questioning of IRR members by active duty military personnel because members of the IRR are not subject to the UCMJ, as they are not listed within Article 2, UCMJ, 10 U.S.C. § 802 (2012).  Further, the Government argues, members of the IRR are not subject to the sorts of military pressures of grade and rank which Article 31(b), UCMJ, was intended to address.

We hold that the plain language of Article 31(b), UCMJ, as informed by the legislative purpose behind the article, makes the article applicable to members of the IRR.  Further, in the context of this case, Sgt Muratori's questioning of Appellant required an Article 31(b), UCMJ, rights advisement because it involved "(1) a person subject to the UCMJ, (2) interrogat[ing] or request[ing] any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard[ed] the

offense of which the person questioned [was] accused or suspected." United States v. Jones, 73 M.J. 357, 361 (C.A.A.F. 2014) (footnotes omitted) (citing United States v. Cohen, 63 M.J. 45, 49 (C.A.A.F. 2006)). This is also a case in which "the military questioner was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity." Id. Accordingly, we reverse.

### BACKGROUND

Appellant enlisted in the Marine Corps in 2006 through the Delayed Entry Program, began active duty service in 2007, and, from June 2009 until the conclusion of his active duty service, served as the armory custodian for Force Reconnaissance Company, First Reconnaissance Battalion at Camp Pendleton, California. Sgt Muratori served as the company training chief and headquarters platoon sergeant for Force Company. Sgt Muratori was always senior to Appellant during his active duty service, and described himself as Appellant's "superior." Among other things, Sgt Muratori testified that "if [Appellant] would have [proficiency and conduct markings], I would be the one to recommend [them]." Appellant was also friends with Sgt Muratori. The two men shared a house off base along with their wives.

In January 2011, Appellant left active duty to fulfill the remainder of his service obligation as a member of the IRR.

Having served four years on active duty, he had an additional obligation of four years in the IRR.  He returned home to Oklahoma.  Appellant was issued Department of Defense Form 214, which advised him that he was released from active duty service and that "[w]hile a member of the Marine Corps Reserve, you will keep the Commanding General, MOBCOM . . . informed of any change of address, marital status, number of dependents, civilian employment, or physical standards.  Subject to active duty recall and/or annual screening."

According to Sgt Muratori's sworn statement, in May 2011, Captain (Capt) John Collins -- the Executive Officer for Force Company -- "spoke to [him] about the screwed up paperwork" regarding an M1911 pistol.  Sgt Muratori testified that "we did not have the pistol and we were trying to find paperwork to figure out where the pistol had gone."  According to the sworn statement, on May 5, 2011, Capt Collins "told [him] to find out about the paperwork screw up with the 1911."[2]

Sgt Muratori began to look into the matter, and discovered that the responsible platoon "hadn't seen [the] weapon since January 2010."  He decided that Appellant, who had served as armory custodian at the time, "seemed like a logical person to

---

[2] Capt Collins had deployed to Afghanistan at the time of trial, and did not testify to clarify his exact words to Sgt Muratori. Trial counsel phrased the conversation as Sgt Muratori being "tasked to try to figure out what was going on with the paperwork."

ask" about the pistol. Sgt Muratori then directed junior Marines in the armory to telephone Appellant and "not to accuse him of anything, just to ask if he had any situation awareness on where the [pistol] might be. I didn't want him to be on the defensive."

The junior Marines left a message for Appellant, who returned the phone call. Lance Corporal Thomas Olson answered, after which Sgt Muratori "took the phone and talked to [Appellant.]" Without identifying which pistol from the armory he was discussing, Sgt Muratori informed Appellant that a pistol was missing and asked if he knew about it. Appellant immediately knew which pistol Sgt Muratori was referencing, and claimed that it "went up to Quantico to get destroyed." Sgt Muratori considered this response to be a "dead give away," asked Appellant "to shoot straight with [him]," and "asked him where the 1911 was." He told Appellant that "a lot of people's heads [were] on the line" because of the missing weapon.

At this point, Appellant came clean and told Sgt Muratori that he knew where the pistol was -- he had it. Sgt Muratori informed Appellant that the pistol would need to be returned. He then immediately reported the substance of the conversation to Capt Collins. Sgt Muratori called Appellant again and, at the recommendation of Capt Collins, "told him that he should

turn himself in." Appellant then offered to return the pistol, and reached an agreement with Sgt Muratori to do so.

Sgt Muratori again reported the conversation to Capt Collins, and advised him that Appellant had agreed to resolve the issue by returning the pistol. In response, Capt Collins told Sgt Muratori that "the whole thing was going to be handled another way." Sgt Muratori then called Appellant once more, informing him that there was nothing for either of them to do except to "stand by."

The Naval Criminal Investigative Service (NCIS) then contacted Sgt Muratori "very quickly." Sgt Muratori gave a sworn statement, and was asked whether he would agree to "meet up with [Appellant] and get the pistol back." Sgt Muratori then drove with NCIS special agents to an intended meeting spot in Texas, during which time NCIS recorded additional phone calls between Sgt Muratori and Appellant. During these phone calls, Appellant was not informed of any law enforcement involvement, and Sgt Muratori assured him that "I might have to talk to Captain Collins . . . . Other than that, I won't talk to anybody."

NCIS eventually became aware that Appellant had retained counsel. The special agents "made the decision, at that point, to go overt with the operation." NCIS contacted Appellant, and Appellant's attorney -- now in possession of the pistol --

contacted NCIS, offering to surrender the weapon. NCIS retrieved the pistol, and the Secretary of the Navy approved the Marine Corps's request to involuntarily recall Appellant from the IRR to active duty for purpose of court-martial pursuant to Article 2, UCMJ, and Article 3, UCMJ, 10 U.S.C. § 803 (2012). At no time was Appellant provided with Article 31(b), UCMJ, warnings by Sgt Muratori or NCIS.

At trial, the defense moved to suppress "any statements of the accused elicited in violation of his Article 31(b) rights and the incriminating evidence derived from such statements." The defense motion cited this Court's decisions, including United States v. Swift, 53 M.J. 439 (C.A.A.F. 2000), to assert that "[t]he case law and the legislative history of Article 31(b) reveal that [Appellant] deserves [its] protections." Quoting Swift, 53 M.J. at 445, the defense contended that "Article 31(b) mandates rights warnings for anyone 'suspected of an offense'" under the UCMJ. Moreover, the defense asserted that "the Marine Corps [is] famed for producing highly obedient individuals who exercise immediate obedience to orders and immediate response to questions, factors that likely would not be lost a mere [four] months after the end of active service." Thus, Appellant argued that the matter should be resolved as any other motion based on Article 31(b), UCMJ, arising in the military justice system.

The Government opposed the motion.  At the threshold, the Government contended that "members of the IRR may not invoke the protections of Article 31(b), UCMJ."  In support of this position, the Government cited United States v. Christian, 6 M.J. 624 (A.C.M.R. 1978), asserting that an individual "not subject to the Uniform Code of Military Justice [under Articles 2 and 3] . . . could not invoke Article 31 thereof."  Id. at 625.  The Government argued that "members of the IRR are immune from the positional pressure that stems from an inquiry by a senior officer," and therefore not entitled to the protection of Article 31(b), UCMJ.  Finally, even if Appellant was entitled to Article 31(b), UCMJ, rights as a general matter, in the Government's view, no rights warning was required in this case because Sgt Muratori "was not engaged in a disciplinary investigation," and "once he established that the accused was in possession of the pistol, his single line of inquiry involved determining how the accused was going to return the weapon."

The military judge accepted the Government's argument and denied Appellant relief.  On the question of applying Article 31(b), UCMJ, to an IRR member, the military judge concluded that Appellant "was not subject to the UCMJ and thus not entitled to the added protections of Article 31(b)."  Notwithstanding that conclusion, the military judge also held that pursuant to United States v. Duga, 10 M.J. 206 (C.M.A. 1981), "Sgt Muratori was not

9

acting in a law enforcement or disciplinary function," and therefore was not required to warn against self-incrimination.

On appeal, a majority of the NMCCA concluded that "[r]ead literally, Article 31(b) has a broad sweep, and would apply to the situation at hand, as Sgt [Muratori] was clearly 'a person subject to this chapter' and was requesting a statement from the appellant, whom he suspected of an offense." Gilbreath, 2013 CCA LEXIS 954, at *7-*8, 2013 WL 5978034, at *3. However, the CCA also noted that taking into account the purposes of the article, members of the IRR are "far removed in time and place from the coercive military environment contemplated by Congress," and have only "attenuated" ties to military authority. Id. at *10, 2013 WL 5978034, at *3. Therefore, while the article might literally apply, the CCA concluded:

> If Congress created Article 31(b) as "a precautionary measure," meant to counteract the implicit coercion of the military command structure, that precaution is unnecessary in these circumstances, in which the appellant was far removed from any military environment that "might operate to deprive [him] of his free election to speak or to remain silent." [United States v. Gibson, 3 C.M.A. 746, 754, 14 C.M.R. 164, 172 (1954.)] In determining whether the protections of Article 31(b) extend to members of the IRR, who are themselves not subject to the UCMJ, "[j]udicial discretion indicates a necessity for denying its application to a situation not considered by its framers, and wholly unrelated to the reasons for its creation." Id. at 170. We eschew a literal application of Article 31(b) and conclude that the military judge did not err in determining that the appellant was not entitled to the protections of Article 31(b).

United States v. Gilbreath, No. 14-0322/MC

Id. at *11-*12, 2013 WL 5978034, at *4 (first and third

alterations in original).  Having reached that conclusion, the

lower court declined to address the specific facts of Sgt

Muratori's questioning.[3]

DISCUSSION

THE GENERAL APPLICATION OF ARTICLE 31(b), UCMJ

The question of whether Article 31(b), UCMJ, applies in the

circumstance of an active duty servicemember questioning a

member of the IRR, as a question of law, is reviewed de novo.

See United States v. Watson, 71 M.J. 54, 56 (C.A.A.F. 2012)

(citation omitted) ("[W]here the issue appealed involves pure

questions of law, we utilize a de novo review.").

Our analysis "begins with the language of the statute."

Leocal v. Ashcroft, 543 U.S. 1, 8 (2004).  Article 31(b), UCMJ,

reads:

> No person subject to this chapter may interrogate, or
> request any statement from, an accused or a person

---

[3] Judge Fischer concurred in the result, finding that Appellant's status in the IRR was not dispositive.  Gilbreath, 2013 CCA LEXIS 954, at *12, 2013 WL 5978034, at *4 (Fischer, J., concurring in the result).  Rather, Judge Fischer found that Sgt Muratori was acting in an official law enforcement or disciplinary capacity under the totality of the circumstances, but Appellant did not subjectively perceive that he was doing so pursuant to the second prong of Duga, 10 M.J. at 210 (applying a subjective analysis), overruled in part by Jones, 73 M.J. at 362 (explicitly rejecting a subjective test).  Therefore, applying our prior case law without the benefit of Jones, Judge Fischer found Appellant's incriminatory statement to be admissible. Gilbreath, 2013 CCA LEXIS 954, at *19-*20, 2013 WL 5978034, at *6.

> suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

What is immediately apparent from a plain text reading is that Article 31(b), UCMJ, is a proscription that applies to the questioner. That is why our cases are primarily concerned with "the questioner's status and the military context in which the questioning occurs." Cohen, 63 M.J. at 49. Thus, the appropriate analysis works forward from whether the facts and circumstances require the questioner to comply with Article 31(b), UCMJ, not from the question of whether the suspect is entitled to Article 31(b), UCMJ, rights. See, e.g., United States v. Gardinier, 65 M.J. 60, 62 (C.A.A.F. 2007) ("A military investigator who interviews a suspect must provide that suspect with the statutorily required rights warnings under Article 31(b), UCMJ.").

The enactment of Article 31(b), UCMJ, "reflect[ed] a decision by the post-World War II Congress -- which included many veterans familiar with the military justice system and its relationship to military missions and operational requirements -- that the unique circumstances of military service required specific statutory protections for members of the Armed Forces." Swift, 53 M.J. at 445. As illustrated by the testimony of Mr.

12

Felix Larkin, Associate General Counsel for the Department of Defense, the drafters of Article 31(b), UCMJ, understood that they were writing law to govern the questioning of suspects within the military justice system, and enacting a proscription that applies against the questioner:

> [Article 31(b), UCMJ,] covers a wider scope [than the Articles of War] in that you can't force a man to incriminate himself beforehand -- not just on the trial, if you will.  And this in addition, since it prohibits any person trying to force a person accused or one suspected, would make it a crime for any officer or any person who tries to force a person to do that.

Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. on Armed Servs., 81st Cong. 914 (1949) (statement of Felix Larkin, Ass't General Counsel, Dep't of Defense), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated).

The plain text of the statute also draws a distinction between the questioner, who is a person subject to the UCMJ, and the individual being questioned, who is "an accused or a person suspected of an offense."  Article 31(b), UCMJ.  This latter provision directs itself to a person who is suspected of an offense under the UCMJ, and is not addressed to the military status of the person questioned.  It is not dissimilar from language elsewhere in the UCMJ directed to any "person," which is directed toward the interaction of the military justice system and external persons.  See, e.g., Article 48(a), UCMJ, 10 U.S.C. § 848(a) (2012) (military judges' authority to punish

13

United States v. Gilbreath, No. 14-0322/MC

"any person" for contempt of court); Article 106, UCMJ, 10

U.S.C. § 906 (2012) ("[a]ny person" acting as a spy during a

time of war may be tried by general court-martial or military

commission); Article 121(a), UCMJ, 10 U.S.C. § 921(a) (2012)

(larceny under the UCMJ is committed by a person subject to the

UCMJ and involves the property of "another person").[4]

   The reach of Article 31(b), UCMJ, however, is not

unlimited.  The text is limited to "interrogation and the taking

of 'any' statement."  Cohen, 63 M.J. at 49 (discussing United

States v. Gibson, 3 C.M.A. 746, 752, 14 C.M.R. 164, 170 (1954)).

Thus, application of Article 31(b), UCMJ, involves a contextual

assessment of what is meant by "interrogation and the taking of

'any' statement" in the armed forces.  Id.

   Further, this Court has recognized that "were these textual

predicates applied literally, Article 31(b) would potentially

have a comprehensive and unintended reach into all aspects of

military life and mission."  Id.  As a result, this Court does

---

[4] In reforming the armed forces after World War II, Congress
contemplated that individual members might serve in the Ready
Reserve.  See Armed Forces Reserve Act of 1952, 66 Stat. 481,
483 (requiring that each branch of the Armed Forces establish a
Ready Reserve comprised of units or members, or both).  And
individuals have done so well before Congress established the
IRR as a matter of statutory law in Pub. L. 103-337,
§ 1661(a)(1), 108 Stat. 2663, 2973 (1994).  See, e.g., No. S.
Rep. 96-197, at 102 (1979), reprinted in 1979 U.S.C.C.A.N. 1818,
1821 (describing the IRR as "the primary force of trained
individuals for replacement and augmentation in emergencies").

14

not interpret Article 31(b), UCMJ, to reach literal but absurd results, such as imposing a rights warning requirement in an operational context where it could impede success of the military mission. United States v. Loukas, 29 M.J. 385, 389 (C.M.A. 1990). Rather, this Court has long looked to the purposes behind the article to inform its contextual application.

Specifically, Congress intended Article 31(b), UCMJ, to address the subtle and not so subtle pressures that apply to military life and might cause members of the armed forces to feel compelled to self-incriminate. The "unique circumstances of military service require[] specific statutory protections for members of the armed forces" from coercive self-incrimination. Swift, 53 M.J. at 445. In this regard, the CCA concluded that IRR members are "far removed in time and place from the coercive military environment contemplated by Congress," and thus held as a matter of law that Article 31(b), UCMJ, does not apply to active duty military members questioning members of the IRR. Gilbreath, 2013 CCA LEXIS 954, at *10, 2013 WL 5978034, at *3. We disagree. The IRR can be every bit as "coercive," or perhaps better put, respectful of military grade and rank as active duty service. This is evident when one considers the cultural knowledge of military service and does not just assume constructive knowledge of the law.

United States v. Gilbreath, No. 14-0322/MC

As recent experience demonstrates, IRR members stand ready to set aside civilian life and serve their country when called to active duty. See, e.g., John J. Kruzel, Marines to Alert 1,800 Individual Ready Reservists for Reactivation, Dep't of Defense News (Mar. 26, 2007), http://www.defense.gov/news/newsarticle.aspx?id=32588. Therefore, a member of the IRR:

> has not become a full-fledged civilian and his military status is such that he is in fact part and parcel of the armed services. . . . He is part of that body of men who [are] characterized as ready reserves, and he is subject to serve on active duty almost at the scratch of the Presidential pen. . . .

United States v. Wheeler, 10 C.M.A. 646, 655, 28 C.M.R. 212, 221 (1959) (Latimer, J.) (plurality). In this case, Appellant had just left active duty service and was still imbued with the cultural norms of the Marine Corps, reflected by his immediate response to calls from junior Marines in the Armory.

Because an IRR servicemember may well feel compelled to respond to an official military questioner without considering any privilege against self-incrimination, we have no reason to depart from our case law, supported by a plain reading of the statute, its legislative history, and the fundamental purpose of the statutory protection as expounded in Jones, Cohen, and Swift. Thus, we hold that the lower court erred in concluding that as a matter of law the article does not apply in the case

16

of an active duty military servicemember questioning a member of the IRR.  Article 31(b), UCMJ, governs official questioning in the military justice system, and absent any statutory command to the contrary, an IRR member who is sufficiently integrated into the military to qualify for court-martial jurisdiction is sufficiently integrated so as to be entitled to the statutory protection of the article.  See United States v. Stevenson, 53 M.J. 257, 259 (C.A.A.F. 2000) (provision of the Military Rules of Evidence (M.R.E.) applies to all courts-martial absent specific exclusion).

## ARTICLE 31(b), UCMJ, APPLIED

Having concluded that Article 31(b), UCMJ, is applicable in the case of active duty military personnel questioning members of the IRR, we turn to whether it applies in this case.  "'When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo.'"  Jones, 73 M.J. at 360 (quoting Swift, 53 M.J. at 446).  Under these standards, "a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect."  United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995).

This case involves a tasking from Capt Collins to Sgt Muratori, the gravamen of which was to investigate a missing

17

weapon in the Marine Corps.  Our task is to determine whether Sgt Muratori was acting in an official capacity, including law enforcement or disciplinary capacity, when he questioned Appellant, as distinct from acting in a manner that is "informal or personally motivated."  United States v. Brown, 40 M.J. 152, 154 (C.M.A. 1994).  In considering this question, we look to all of the facts and circumstances surrounding the questioning, including Sgt Muratori's "authorities and responsibilities" as related to Appellant.  Cohen, 63 M.J. at 51.

The military judge in this case concluded that no rights warning was required, because "[Sgt] Muratori was attempting to clear up the discrepancy not get [Appellant] in trouble.  The evidence demonstrated that [Appellant] perceived the conversation to be informal and that [Sgt] Muratori would attempt to resolve the issue on behalf of [Appellant] without command involvement."

We disagree, and conclude that the military judge erred in reaching this conclusion.  Sgt Muratori's own preference to avoid the military justice system is not dispositive.  As discussed below, the appropriate analysis looks objectively to the facts and circumstances of the questioning, not the suspect's subjective perceptions.  Jones, 73 M.J. at 362.

The circumstances of this case demonstrate that Sgt Muratori was acting in an official capacity when he questioned

18

Appellant.  Among other things, Sgt Muratori was acting at the direction of his superior commissioned officer, Capt Collins. He immediately reported the progress of the investigation to Capt Collins.  And, he used elicitation tactics to discover more information than Appellant initially volunteered.  In this setting, we have no doubt that Sgt Muratori "was acting or could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity" during the questioning. Jones, 73 M.J. at 362.

The Government's response -- that Sgt Muratori was acting in an administrative or operational capacity -- is not persuasive.  Even if Sgt Muratori hoped to confine the matter of a missing pistol to a wholly administrative issue to be resolved outside the military justice system, a questioner's "administrative focus . . . does not ultimately answer the critical question as to whether he was acting in an official law enforcement or disciplinary capacity while also performing his administrative duties."  Cohen, 63 M.J. at 51.  The answer to that question is found in reviewing the totality of the circumstances, not in a bright-line distinction between law enforcement or disciplinary duties and administrative duties.

Perhaps most critically, in this case, Sgt Muratori's questioning regarded the whereabouts of a missing weapon in the Marine Corps.  Sgt Muratori testified to the significance of

this factor: "[P]retty much everybody is very quick to throw their hand up and say . . . I don't want to deal with that because it's such a serious deal." This cultural understanding is significant to our analysis and belies the notion that Sgt Muratori and Appellant were merely engaged in an informal discussion as friends. As Appellant states in his brief, "There is no such thing as a casual discussion about a missing or stolen weapon in the Marine Corps."

An individual member of the Ready Reserve equipped with this cultural knowledge might feel compelled to respond to questions asked by a more senior NCO. That fact is particularly evident here, where Appellant incriminated himself in response to Sgt Muratori's questioning and invocation of military duty. Sgt Muratori's questioning therefore falls within the scope of Article 31(b), UCMJ, and demonstrates the reason why Congress legislated in this area. See Swift, 53 M.J. at 445 ("In such an environment, a question from a superior or an investigator is likely to trigger a direct response without any consideration of the privilege against self-incrimination."). Once Sgt Muratori suspected Appellant of committing larceny, he was required under Article 31(b), UCMJ, to advise him of his privilege against self-incrimination before pursuing further questioning.

The UCMJ and the M.R.E. provide that a statement obtained without a rights warning is akin to an involuntary statement,

20

and is inadmissible.  Article 31(d), UCMJ; M.R.E. 305(a); M.R.E.
304(a).  As we have previously noted, although the UCMJ has
undergone several revisions since 1951, Congress has kept this
"strict enforcement mechanism" intact.  Swift, 53 M.J. at 448-
49.  As a result, Appellant's statement to Sgt Muratori was
inadmissible, and the military judge erred in denying the motion
to suppress.

The question of whether Appellant was prejudiced by this
ruling turns on "(1) the strength of the Government's case, (2)
the strength of the defense case, (3) the materiality of the
evidence in question, and (4) the quality of the evidence in
question."  United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F.
1999).  In this case, the Government's case derived from
Appellant's initial admission to Sgt Muratori.  There was no
other parallel chain of evidence.  Moreover, "[a] confession is
like no other evidence.  Indeed, the defendant's own confession
is probably the most probative and damaging evidence that can be
admitted against him."  United States v. Ellis, 57 M.J. 375, 381
(C.A.A.F. 2002) (quoting Arizona v. Fulminante, 499 U.S. 279,
296 (1991)) (internal quotation marks omitted).  There is no
question that Appellant's confession constituted strong,
material evidence offered against him.  Under these
circumstances, the military judge's error materially prejudiced

21

United States v. Gilbreath, No. 14-0322/MC

Appellant's substantial rights under Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2012).

CONCLUSION

We hold that Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), applies to active duty military members questioning members of the IRR; as a result, depending on the facts and circumstances of a particular case, an active duty military questioner may be required to warn an individual member of the Ready Reserve against self-incrimination. We further hold, applying the analysis from the United States v. Jones, 73 M.J. 357 (C.A.A.F. 2014), and United States v. Cohen, 63 M.J. 45 (C.A.A.F. 2006), line of cases, that such a warning was required in this case.

Accordingly, the decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed. The finding and sentence are set aside. The record of trial is returned to the Judge Advocate General, and a rehearing may be authorized.