*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

———————————————

**UNITED STATES**
*Appellee*

**v.**

**Barnabas E. PEARSON**
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

**No. 201900314**

Decided: 29 March 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
John L. Ferriter (arraignment, motions)
Jeffrey V. Muñoz (motions, trial)

Sentence adjudged 25 July 2019 by a general court-martial convened at Marine Corps Air Station Yuma, Arizona, consisting of officer and enlisted members. Sentence in the Entry of Judgment: confinement for eight months and a dishonorable discharge.

For Appellant:
*Captain Mary Claire Finnen, USMC*

For Appellee:
*Lieutenant Commander Jeffrey S. Marden, JAGC, USN*

Chief Judge MONAHAN delivered the opinion of the Court, in which Senior Judge STEPHENS and Judge DEERWESTER joined.

—————————————

**PUBLISHED OPINION OF THE COURT**

—————————————

MONAHAN, Chief Judge:

Appellant was convicted, contrary to his pleas, of one specification of sexual abuse of a child on divers occasions and one specification of receipt, viewing, and possession of child pornography on divers occasions, in violation of Articles 120b and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 920b and 934.

Appellant asserts four assignments of error [AOEs]:[1] (1) this Court lacks jurisdiction to act on the findings and sentence because the convening authority took "no action" on the sentence;[2] (2) the military judge erred in failing to suppress Appellant's statements to a civilian law enforcement officer and his subsequent statements to the Naval Criminal Investigative Service [NCIS]; (3) the evidence is legally and factually insufficient to sustain a conviction for receiving, viewing, and possessing child pornography; and (4) Appellant's sentence was inappropriately severe. We find merit in the third AOE because only one of the five images charged images constitutes child pornography. Therefore, we set aside certain language in the child pornography specification and reassess the sentence.

## I. BACKGROUND

### A. Appellant Begins an Online Relationship with a Minor That Becomes Romantic and Sexualized

In June 2017, Miss Johnson,[3] a 15-year-old Jamaican immigrant living in New York City, New York, sent a Facebook friend request to Appellant. Miss Johnson was interested in joining the Marine Corps, and a mutual

—————————————

[1] We have renumbered Appellant's AOEs.

[2] Although not formally raised as an AOE, in his reply brief, Appellant requests the Court remand the record of trial to the convening authority because the convening authority took "no action" despite Appellant's request for clemency.

[3] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

friend suggested that she get to know Appellant. At the time, Appellant was 25 years old and training to become an airplane mechanic. Appellant and Miss Johnson began communicating through online messaging, audio calls, and video chats, and initially he spoke to her primarily as a mentor because of her aspirations of becoming a Marine. However, in late-July or early-August 2017, while Appellant was completing his training at Marine Corps Air Station Cherry Point, North Carolina, [MCAS Cherry Point], the nature of Appellant's and Miss Johnson's online relationship became romantic. After that point, Miss Johnson referred to Appellant as her boyfriend and told him personal details about her life, to include the fact that she had previously suffered abuse at the hands of family members.

**B. Miss Johnson Reports Appellant to Law Enforcement as a Missing Person After He Attempts to End Their Relationship**

In late-October 2017, shortly before transferring to Marine Corps Air Station Yuma, Arizona [MCAS Yuma] to begin his first Fleet assignment, Appellant attempted to end his relationship with Miss Johnson by telling her that they needed to stop communicating. He then blocked her on Facebook and deleted all of their text conversations from that application. Miss Johnson was upset that Appellant had terminated contact with her. On 31 October 2017, within days of him reporting to his new duty station, she called the Yuma Police Department [YPD] to report Appellant as a missing person because she had not been able to contact him. When making her report, Miss Johnson identified Appellant as her boyfriend, and informed the police dispatcher that she was 15 years old and he was 25 years old.

Shortly after Miss Johnson had spoken to the YPD dispatcher, Officer [Off.] India was tasked with calling Miss Johnson to follow up on the missing person report. Having retired as a Gunnery Sergeant (E-7) from the regular component of the Marine Corps in 2008, Off. India had served as a civilian police officer for the YPD since then. In his capacity as a YPD officer, he had worked with military investigators at MCAS Yuma in the past, including the Provost Marshal's Office [PMO] and NCIS, and at all relevant times there was a joint cooperation agreement in place between YPD and NCIS.

Reading the call notes from the dispatcher, Off. India was suspicious as to Appellant and Miss Johnson's supposed relationship.[4] However, he mistakenly believed that she lived in Yuma, and that the area code for her call back

---

[4] App. Ex. XXXV at 12.

number had been written incorrectly by the police dispatcher.[5] So, he was unable to make contact with her when he dialed the wrong number (using Yuma's area code).[6]

Off. India then attempted to call Appellant with the number Miss Johnson had provided the dispatcher, and left a message asking Appellant to call him back. He next called the MCAS Yuma PMO to inquire about contact information for Appellant, but the PMO had none. When Appellant returned his call, Off. India identified himself as a YPD officer, and asked if he knew why he was calling him. Appellant replied that he believed so. Off. India then asked Appellant if Miss Johnson had sent him any nude photographs. Appellant replied that she had sent him one such photograph without him asking, but that he deleted it after she sent it. Off. India asked Appellant if there was anything else, and Appellant said there had been a video chat during which Miss Johnson had taken all of her clothing off. He further admitted that he did not disconnect from the chat as soon as she started taking off her clothing. Off. India asked Appellant if he and Miss Johnson were boyfriend and girlfriend, to which Appellant replied "sort of."[7] Appellant also told Off. India that he was not sure how he could end the relationship without causing her emotional distress, but when he had moved to Yuma, he decided to unfriend and block her on Facebook and no longer talk to her.

Off. India clarified with Appellant as to when he had received the naked photo from Miss Johnson and had participated in the video chat during which she had removed articles of clothing. Appellant told Off. India that this occurred while he was stationed at MCAS Cherry Point. Off. India asked Appellant if they had ever met in person, and Appellant said they had not. Believing that she lived in Yuma, Off. India pressed Appellant about meeting her in person, and Appellant explained that she lived in New York City. At no time during their conversation did Off. India inform Appellant that he was a retired Marine Gunnery Sergeant.

After speaking with Appellant, Off. India called Miss Johnson again, this time using her correct area code and successfully reached her. Miss Johnson asserted that she had sent nude photographs to Appellant at his request and said that she had also taken off all of her clothing during a video chat with Appellant. After speaking with Miss Johnson, Off. India got in contact with

---

[5] *Id.*

[6] *Id.*

[7] R. at 642.

the on-duty NCIS agent, Special Agent [SA] Williams. He called Off. India back, and the two law enforcement officers agreed to meet at YPD's headquarters later that evening. During the meeting, Off. India told SA Williams everything he had learned concerning Appellant and Miss Johnson's relationship.

When SA Williams returned to his office at MCAS Yuma from YPD's headquarters it was late in the evening. However, he immediately initiated an investigation and contacted Appellant's command to request that he be brought to the NCIS office that evening for a potential interview. Appellant was subsequently awoken and escorted from his barracks room to the NCIS office by a commissioned officer from his unit. Shortly before midnight, SA Williams administered Article 31(b) warnings, and Appellant waived his rights. SA Williams and another NCIS special agent subsequently interrogated Appellant for approximately two hours.

During the interrogation, Appellant informed the agents that Miss Johnson had sent him a Facebook friend request while he was stationed in Pensacola, Florida, and that he then transferred to MCAS Cherry Point, where he continued to communicate with her online. Appellant admitted that Miss Johnson told him she was 15 years old within a couple of weeks after he began communicating with her. Appellant acknowledged that during their online relationship, Miss Johnson referred to him as her boyfriend. He also admitted exchanging one or two sexually explicit messages with her.

Appellant further acknowledged receiving an unsolicited naked picture of Miss Johnson, which he described as her standing in a shower covering her breasts with her arm, in which nothing was visible beneath her waist.[8] Although he initially claimed that he was not sure whether he received the photo before or after he had learned her age, he later admitted to the agents that when he asked Miss Johnson why she had sent him the naked photo, he told her that he could get in trouble for that because of her age. Appellant further told the agents that his phone automatically saved all photos sent to him over Facebook Messenger, and that he deleted the naked photo that Miss Johnson had sent him after approximately a week. Appellant also informed the agents that on one occasion while he was video chatting with Miss Johnson, after telling him she felt hot, she removed her shirt and bra, exposing her bare breasts to him over the camera. However, Appellant told the agents that he told her at the time she did not have to do that.

---

[8] This photo was later extracted from Appellant's phone and admitted into evidence as part of Pros. Ex. 5, Image 5e. See discussion *infra*.

With regard to how their relationship ended, Appellant told the NCIS agents that shortly before he transferred to MCAS Yuma, he tried to stop communications with Miss Johnson, to include blocking her on Facebook.

## C. Incriminating Evidence Is Found on Appellant's Cell Phone and Computer Following Forensic Examination

During the interrogation, the NCIS agents sought and obtained from Appellant a permissive authorization for search and seizure [PASS] for his cell phone, which they then seized. Later that same morning, after Appellant had returned to his barracks room, gotten a few hours of sleep, and begun to start his workday, the NCIS agents asked his unit to escort him to their office a second time. When Appellant was returned to the NCIS office, the agents asked for and obtained from him a PASS to search his barracks room and seize his laptop computer. Next, the agents escorted Appellant to his barracks room, where he retrieved his laptop and provided it to them.

Following the seizure of the devices, Appellant's cell phone and laptop computer were forensically analyzed. Suspected images of child pornography were located on Appellant's cell phone. Additionally, the analysis of his laptop computer yielded an internet browsing history showing that the phrase "Jamaican teen" had been entered as a search term on a legal pornography site during the charged time period.[9]

## D. Pretrial Motions

Prior to trial, Appellant moved to suppress his statements to Off. India, arguing that Off. India was required to provide him Article 31(b) rights warnings because: (1) Off. India was working in concert with military authorities to the extent that his civilian investigation became indivisible with the military investigation; and (2) Off. India was acting in furtherance of a military investigation. SA Williams testified on the motion that NCIS never directed Off. India in his investigation of Appellant, and that NCIS did not advise, counsel, guide, or assist Off. India in his investigation. He also testified that YPD conducted a completely separate and independent investigation from NCIS's investigation into Appellant's relationship with Miss Johnson. The military judge denied the motion, concluding that there was no merger of investigations and that Off. India was neither acting in furtherance of a military investigation nor serving as an instrument of the military.

---

[9] Pros. Ex. 7, at 35.

Appellant also moved before trial to suppress his statements to NCIS as illegally obtained derivative evidence, arguing that he was apprehended without probable cause before he was interrogated by that agency. The military judge denied the motion, concluding that although Appellant was apprehended prior to providing his statements to NCIS, the apprehension was based on probable cause. Specifically, the military judge found the following information Off. India conveyed to SA Williams prior to Appellant's apprehension constituted probable cause: Appellant, a 25-year-old Marine, was involved in some sort of a relationship with a 15-year-old girl, wherein he received at least one nude photograph of the girl and had also participated in a nude live video chat session with her.

**E. Trial**

At trial, the military judge admitted Prosecution Exhibit [Pros. Ex.] 5, which contained five images of Miss Johnson in varying states of nudity, and which were extracted from Appellant's cell phone. Image 5a depicted her fully naked and lying on a bed. Images 5b-5d depicted her topless and wearing underwear. Image 5e depicted her fully naked and standing in a shower. The Government's expert in the field of digital forensics and analysis testified that these images were found in either thumbnail or cache format, which can be consistent with images having been deleted from a cell phone. The Government's expert also testified that the caching process, which is a type of back up, can happen automatically. However, he also testified that to appear in cache format, digital images normally would have first been saved, such as in a cell phone's photo gallery. Moreover, the Government's expert testified that if, in fact, the images in question had been deleted, it was impossible to tell if the images were deleted immediately or saved for a longer period, such as a week or a month, before they were deleted.

The military judge also admitted Pros. Ex. 8, which contained screenshots of numerous text communications sent back and forth between Appellant and Miss Johnson via Facebook Messenger. Miss Johnson provided these text messages to SA Williams during NCIS's investigation. They showed that Appellant sent Miss Johnson sexually explicit texts on more than one occasion.

Miss Johnson testified at trial that she told Appellant on the first day they communicated that she was 15 years old. She testified that after their online relationship became romantic, on more than one occasion he made sexual communications to her in both video chats and in Facebook messenger texts, and that she masturbated on camera using a glass bottle on multiple occasions at Appellant's request. She also testified that in the text messages between her and Appellant, admitted as Pros. Ex. 8, she said, "My cervix

hurts since yesterday,"[10] which she explained was in reference to the pain she felt after Appellant asked her to masturbate with the glass bottle.

Miss Johnson further testified on direct that Appellant asked her to send him photos of herself,[11] and when she sent him pictures in which she was clothed, he replied, "Not those type of pictures."[12] She testified that during the course of their relationship, and always at Appellant's request, she sent him photos of herself on various occasions in which she was either partially or fully naked. She testified that she was the person in each of the five photos contained in Pros. Ex. 5, that she was 15 years old when she took those pictures of herself, and that she sent each of the five photos to Appellant during the charged time period. Additionally, Miss Johnson testified that after Appellant received each of the photos, he would normally tell her afterwards when they were video chatting that he liked what he saw in the photo and that he wanted more of them.

On cross-examination, Miss Johnson was evasive, and her testimony on a variety of topics was significantly impeached by the Trial Defense Counsel [TDC]. Additionally, after acknowledging on cross that she had called TDC in January 2019,[13] she denied telling TDC that Appellant had not asked her for all of the nude photos she had sent him. Later in the trial, the Defense offered the testimony of a Defense legal clerk, who had been a witness to the pretrial conversation between Miss Johnson and TDC. The legal clerk testified that during the phone call, Miss Johnson told TDC that although Appellant had solicited nude photos from her on one occasion, she had sent other nude photos to him at other times without him asking her to do so.

The Defense also offered the testimony of its own expert in the field of digital forensic examination. The Defense expert testified that Facebook Messenger has a setting that allows a user to automatically download photos contained in messages sent to the user. The Defense expert further explained that if this setting is activated in a user's device, any photos sent via

---

[10] R. at 799; Pros. Ex. 8, at 27.

[11] Prosecution Exhibit 8, which contains 44 pages of Facebook message texts between Appellant and Miss Johnson, reflects two occasions when Appellant requests pictures of her. However, these texts are silent on the issue of whether he is asking for nude photos. Pros. Ex. 8, at 1-2, 23.

[12] R. at 793.

[13] This conversation occurred after charges had been preferred and the Article 32 preliminary hearing had been held in the case.

Facebook Messenger to the user would be automatically saved in his photo gallery without further manual action.

## F. Post-Trial

The earliest date of both offenses of which Appellant was convicted was 1 August 2017. Therefore, the version of Article 60 applicable in this case[14] directs that "[a]ction on the sentence of a court-martial shall be taken by the convening authority or by another person authorized to act under this section."[15] Despite this requirement, the convening authority indicated, "NO ACTION," on the Convening Authority's Action and Entry of Judgment Form.

## II. DISCUSSION

### A. Jurisdiction

We review questions of jurisdiction de novo.[16]

The courts of criminal appeals are courts of limited jurisdiction, defined entirely by statute.[17] Prior to January 2019, our appellate jurisdiction to act with respect to the findings and sentence of a court-martial required an adjudged sentence that (1) included death, a punitive discharge, or confinement for one year or more; and (2) was approved by the convening authority.[18] Therefore, until a convening authority acted to approve a sentence pursuant to Article 60, this Court did not possess appellate jurisdiction.

Congress amended post-trial procedures in the Military Justice Act of 2016 [MJA 2016], which came into effect on 1 January 2019.[19] For cases referred after that date, this Court's appellate jurisdiction, pursuant to Article 66 (2018), is no longer dependent upon the convening authority's action. Instead, a Court of Criminal Appeals has "jurisdiction over a court-martial in which *the judgment entered into the record* under [Article 60c, UCMJ] includes a sentence of death, [a punitive discharge], or confinement

---

[14] *See* Exec. Order 13,825, 83 Fed. Reg. 9,890 (1 March 2018).

[15] UCMJ art. 60(c)(2)(A) (2012 & Supp. V 2018).

[16] *United States v. Ali*, 71 M.J. 256, 261 (C.A.A.F. 2012).

[17] *United States v. Arness*, 74 M.J. 441, 442 (C.A.A.F. 2015).

[18] UCMJ art. 66(b) (2012 & Supp V 2018).

[19] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5321-30, 130 Stat. 2000 (2016); Exec. Order 13,825.

for 2 years or more."[20] Article 66(d)(1) provides further that this Court "may act only with respect to the findings and sentence as entered into the record under [Article 60c, UCMJ]." Article 60c(a)(1) requires the military judge to include in the Statement of Trial Results "any post-trial action by the convening authority."

In light of the amendments to Article 60 over the past decade, the President, via executive order, directed that the version of Article 60 applicable to a court-martial is dependent on the earliest date of misconduct for which an accused was convicted.[21] As that date in this case is in 2017, the operative version of Article 60 requires convening authority action. We agree with the Army Court of Criminal Appeals that if a convening authority states, "No Action," the convening authority's failure to take action is error.[22]

However, we also agree with our sister court that the convening authority's failure to take action in the case does not deprive this Court of jurisdiction.[23] The charges against Appellant were referred on 22 January 2019. Therefore, MJA 2016 post-trial procedures were applicable in Appellant's case.[24] Here, *the judgment entered into the record* includes a sentence to a dishonorable discharge and reflects that the convening authority took no post-trial action to alter the adjudged sentence. Thus, this Court has jurisdiction to review Appellant's case, notwithstanding the convening authority's error in not taking action on Appellant's sentence.[25]

As the convening authority's error is not jurisdictional in nature, we test the error for prejudice pursuant to Article 59(a).[26] In this case, it is clear that

---

[20] UCMJ art. 66(b)(3) (2018) (emphasis added).

[21] The Executive Order directs that the version of Article 60 in effect at the time of an appellant's earliest offense is applicable to the extent it: requires convening authority action on the sentence; permits convening action on the findings; authorizes the convening authority to modify the findings of a court-martial in certain respects; authorizes proceedings in revision; and authorizes the convening authority to approve, disapprove, commute, or suspend the sentence. *See* Exec. Order 13,825, 83 Fed. Reg. 9,890 (Mar. 1, 2018).

[22] *United States v. Coffman*, 79 M.J. 820, 823 (Army Ct. Crim. App. 2020).

[23] *See id.*

[24] As noted above, the exception to this rule is the applicable version of Article 60. *See* Exec. Order 13,825, 83 Fed. Reg. 9,890 (1 March 2018).

[25] *See* UCMJ art. 60(c).

[26] *See United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005).

there was no prejudice to any of Appellant's substantial rights. Although the convening authority took "no action" on Appellant's sentence on 21 August 2019, the Convening Authority's Action and Entry of Judgment Form also explicitly indicates that Appellant's various requests for clemency and deferment of certain aspects of the sentence were considered and denied at or before the time the convening authority took "no action" on the sentence.[27] Under these circumstances, we find the convening authority's failure to take action on the sentence constitutes harmless error.

## B. Article 31(b) Warnings

### 1. Standard of review and the law

We review a military judge's denial of a motion to suppress a confession for an abuse of discretion.[28] We review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo.[29]

Generally, an accused must be informed of his *Miranda*[30] rights prior to custodial interrogation. Congress has provided military members, under Article 31(b), with a rights warning requirement that is broader than what is required by *Miranda*.[31] The legislative intent of this statute was "to address the subtle and not so subtle pressures that apply to military life and might cause members of the armed forces to feel compelled to self-incriminate."[32]

Article 31(b) warnings are required when "(1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected."[33] Under Article 31(b)'s

---

[27] Block 35 of the form, Deferment and Waiver of Forfeitures, indicates that Appellant made requests on 25 July 2019, 5 August 2019, and 6 August 2019. Block 35 also indicates that "[a]ll Request [sic] are denied, and were denied initially on 1 August 2019." While Block 35 is not separately dated, it appears from the form that the entry reflecting the convening authority's final denial of Appellant's deferment and waiver requests was made on the date the convening authority signed the form, 21 August 2019.

[28] *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009).

[29] *United States v. Ramos*, 76 M.J. 372, 375 (C.A.A.F. 2017).

[30] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[31] *Ramos*, 76 M.J. at 376.

[32] *United States v. Gilbreath*, 74 M.J. 11, 16 (C.A.A.F. 2014).

[33] *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014).

second requirement, rights warnings are required if "the person conducting the questioning [was] participating in an official law enforcement or disciplinary investigation or inquiry."[34]

A plain text reading of the statute reveals that Article 31(b) is a proscription that applies to the questioner.[35] The Court of Appeals for the Armed Forces [CAAF] has frequently addressed the issue of when Article 31(b) rights warnings must be given, and its cases are primarily concerned with "the questioner's status and the military context in which the questioning occurs."[36] Thus, the appropriate analysis works forward from whether the facts and circumstances require the questioner to comply with Article 31(b), not from the question of whether the suspect is entitled to receive the required rights warnings.[37] However, CAAF has also recognized that the reach of Article 31(b) is not unlimited, and has articulated that it does not interpret Article 31(b) to reach "literal but absurd results."[38]

Civilian law enforcement officials are not required to advise a military member of his or her rights under Article 31(b) and Military Rule of Evidence [Mil. R. Evid.] 305(c), unless they are acting as a knowing agent of a person subject to the UCMJ or of a military unit.[39] CAAF has clarified these requirements, holding that:

> civilian investigators working in conjunction with military officials must comply with Article 31: (1) when the scope and character of the cooperative efforts demonstrate that the two investigations merged into an indivisible entity and (2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the military.[40]

---

[34] *Id.* (quoting *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000)).

[35] *Gilbreath*, 74 M.J. at 15.

[36] *Id.*

[37] *Id.*

[38] *Id.* at 16.

[39] Mil. R. Evid. 305(b)(1), 305(c); *United States v. Rodriguez*, 60 M.J. 239, 252 (C.A.A.F. 2004).

[40] *Rodriguez*, 60 M.J. at 252 (internal quotation marks and citations omitted).

*2. Appellant was not entitled to Article 31(b) warnings solely because Off. India was a retired Marine subject to the UCMJ*

Appellant argues that because of Off. India's status as a retiree of a regular component of the armed forces, Off. India was required to provide him Article 31(b) warnings before questioning him about his relationship with Miss Johnson.[41] We agree that as a retired active component Marine, under a literal reading of Article 31(b), Off. India is subsumed into the first textual predicate ("a person subject to the UCMJ").[42] This does not end our inquiry, however. As CAAF articulated in *United States v. Gilbreath*, it does not interpret Article 31(b) to reach "literal but absurd results." If we were to hold that Off. India was required to read Appellant his rights warnings in the course of performing his duties as a civilian police officer, solely because Off. India was eligible to receive pay as a retired member of an active component of the armed forces, then this would truly be an absurd result. It would be a particularly absurd result where, as here, Off. India did not inform Appellant that he was a retired Marine Gunnery Sergeant, and where Off. India was not acting as an agent, or in any sense an instrument, of military law enforcement when he questioned Appellant. (See discussion *infra*.) Indeed, if Article 31(b)'s first textual predicate were to be applied literally as Appellant exhorts us, then a retired member of a regular component of any of the armed forces who pursued civilian law enforcement as a second career would arguably be required to provide Article 31(b) rights warnings to *any* person (civilian or military) he or she suspected of a criminal offense, before questioning them about that offense while performing his or her duties as a civilian police officer.[43]

---

[41] We have considered but find unpersuasive the Government's argument that Appellant waived his claim that Off. India's status as a retired Marine required him to receive Article 31(b) warnings from Off. India questioning him about his relationship with Miss Johnson. Although Appellant did not explicitly raise this issue in his motion to suppress at trial, the issue was raised implicitly through Appellant's overall argument that Article 31(b) warnings were required under the circumstances. Moreover, in his ruling on the motion, the military judge specifically addressed Off. India's status as a military retiree in his analysis. App. Ex. XCI at 9.

[42] *See* UCMJ art. 2(a)(4); *cf. United States v. Begani*, 79 M.J. 767, 775 (N-M. Ct. Crim. App. 2020) (holding retired members of the Fleet Reserve are subject to the UCMJ), *pet. granted*, 80 M.J. 200 (C.A.A.F. 2020).

[43]     The plain text of the statute also draws a distinction between the questioner, who is a person subject to the UCMJ, and the individual being questioned, who is "an accused or a person suspected of an of-

Therefore, we hold that under Article 31(b)'s second requirement, rights warnings are only necessary if the person conducting the questioning is participating in an official *military* law enforcement or disciplinary investigation or inquiry.[44] Reading this qualifier into the requirement serves Congress's intent of addressing the "subtle and not so subtle pressures that apply to military life and might cause members of the armed forces to feel compelled to self-incriminate,"[45] while simultaneously avoiding foisting an unworkable and unwise framework upon retired military members who pursue a second career in civilian law enforcement and the agencies they serve.

In this case, although Off. India was subject to the UCMJ as a military retiree, he had no UCMJ authority over Appellant. Moreover, Appellant was unaware of Off. India's UCMJ status and, thus, Appellant was not susceptible to the subtle and not so subtle pressures that Article 31(b) was meant to guard against. Unlike the active duty Air Policeman serving as a liaison with local authorities in *United States v. King*, who the Court of Military Appeals held was required to have given Article 31(b) warnings when he questioned the appellant in that case,[46] here Off. India did not use his military status in furtherance of conducting the civilian investigation. Therefore, we find Appellant's argument that Off. India was required to give Article 31(b) rights warnings due to his status as a person subject to the UCMJ to be without merit.

---

fense." Article 31(b), UCMJ. This latter provision directs itself to a person who is suspected of an offense under the UCMJ, and is not addressed to the military status of the person questioned. It is not dissimilar from language elsewhere in the UCMJ directed to any "person," which is directed toward the interaction of the military justice system and external persons.

*Gilbreath*, 74 M.J. at 16.

[44] However, we recognize that if a military member uses his military status in furtherance of a civilian investigation, then Article 31(b) rights warnings are required. *See United States v. King*, 34 C.M.R. 7, 8-11 (C.M.A. 1963) (at the request of a local law enforcement officer, an active duty Air Policeman from the appellant's military installation who served as a liaison officer between the installation and the local community, was asked to come to the district attorney's office to talk to or question the appellant regarding allegations that the appellant had sexually molested his 14-year-old niece).

[45] *See Gilbreath*, 74 M.J. at 16.

[46] *King*, 34 C.M.R. at 8-11.

*3. Off. India was not required to provide Appellant Article 31(b) rights warnings because he did not act as a "knowing agent" of a military unit or of a person subject to the UCMJ*

Appellant argues that Off. India "acted as the military's agent for a military investigative purpose even when the military did not know of, or direct his investigative acts."[47] Specifically, Appellant asserts that although there was no military investigation in existence when Off. India questioned him, the military judge erred when he failed to focus on what Off. India's purpose was—trying to assist NCIS—when he continued to investigate beyond resolving his civilian police department's missing person's case. Appellant also stresses the fact that Off. India had a close tie with the military as a retiree, and, thus, "he did not need a military member to direct him to be an agent."[48]

As an initial matter, we observe that in *United States v. Brisbane*, CAAF articulated that the test for whether Article 31's requirement for rights warnings is not "an issue of the questioner's 'primary purpose.'"[49] However, assuming arguendo that Off. India's primary purpose in questioning Appellant about his relationship with Miss Johnson is essential to the determination of this issue, the facts in the record undercut Appellant's argument. Although Off. India was tasked to investigate a missing person case, he became immediately suspicious of Appellant when he read the police dispatcher's notes that Miss Johnson reported that she was 15 years old and that, Appellant, her "boyfriend," was 25 years old. Moreover, Off. India mistakenly believed that Miss Johnson lived in Yuma, which led him to suspect Appellant may have engaged in criminal sexual activity with her in Yuma, where YPD had jurisdiction. This mistaken belief was only cleared up over the course of his conversation with Appellant, during which Appellant made the admissions that he later sought to suppress. Therefore, we find unpersuasive Appellant's argument that Off. India's primary purpose was to obtain information for NCIS when he questioned him.

Off. India's status as a retired Marine does not change our analysis on this point. Rather, we find that Off. India was simply performing his duties as a civilian police officer by conducting an independent investigation into potential crimes over which YPD held investigatory jurisdiction. Following

---

[47] Appellant's Br. at 48.

[48] *Id.* at 50.

[49] 63 M.J. 106, 112 (C.A.A.F. 2006).

the conclusion of this investigation, he merely turned over the information he had learned from speaking with Appellant and Miss Johnson to SA Williams. Only after that handoff did NCIS open an investigation. Moreover, neither SA Williams nor any military law enforcement official was in any way involved in the investigation that Off. India conducted or the questions he posed to Appellant. Thus, we agree with the military judge that there was no merger of investigations, and that Off. India was neither acting in furtherance of a military investigation nor serving as an instrument of the military. For these reasons, we hold that the military judge did not abuse his discretion by denying the motion to suppress.

*4. Because Off. India was not required to administer Article 31(b) rights warnings, Appellant's argument that his later statement to NCIS should be suppressed fails*

Appellant argues that because his statement to Off. India was illegally obtained due to Off. India's failure to provide him Article 31(b) rights, his statement to NCIS made hours later should be suppressed. However, we have found that Off. India was not required to administer Article 31(b) rights warnings to Appellant. (See discussion *supra*.) Moreover, the record clearly reflects that SA Williams properly advised Appellant of his rights under Article 31(b) prior to interrogation, that Appellant subsequently waived his rights, and that under the totality of the circumstances, Appellant's statement to NCIS was voluntary. Therefore, his argument on this issue is without merit.[50]

## C. Factual and Legal Sufficiency of Child Pornography Offenses

### 1. Standard of review and the law

We review each case de novo for legal and factual sufficiency.[51]

When testing for legal sufficiency, we look at "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[52] Our assessment of legal sufficiency is limited to the evidence

---

[50] *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

[51] UCMJ art. 66; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[52] *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

produced at trial.[53] In performing this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[54] "The standard for legal sufficiency involves a very low threshold to sustain a conviction."[55]

In evaluating factual sufficiency, we must determine whether, after evaluating all the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.[56] In performing this function, we must take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence or a presumption of guilt," and we must make our own, "independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[57] Reasonable doubt, however, does not mean the evidence must be free from conflict.[58]

Article 134 defines "child pornography" as "material that contains either an obscene visual depiction of a minor engaging in sexually explicit conduct or a visual depiction of an actual minor engaging in sexually explicit conduct."[59] Article 134 further defines "sexually explicit conduct," as actual or simulated sexual intercourse or sodomy, bestiality, masturbation, sadistic or masochistic abuse, and "lascivious exhibition of the genitals or pubic area of any person."[60] Child pornography is defined similarly under civilian federal law.[61] Congress has not defined the term "lascivious exhibition" in either Article 134 or its civilian federal counterpart.[62] However, like most civilian

---

[53] *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

[54] *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015) (internal citations omitted).

[55] *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal citations omitted).

[56] *Turner*, 25 M.J. at 325.

[57] *Washington*, 57 M.J. at 399.

[58] *United States v. Lepresti*, 52 M.J. 644, 648 (N-M. Ct. Crim. App. 1999).

[59] *MCM*, pt. IV, para. 68b.c.(1) (2016 ed.).

[60] *MCM*, pt. IV, para. 68b.c.(7) (2016 ed.).

[61] 18 U.S.C. § 2256 (2012).

[62] *United States v. Roderick*, 62 M.J. 425, 429 (C.A.A.F. 2006).

federal courts, CAAF has adopted the factors from *United States v. Dost*[63] to determine whether an image constitutes a "lascivious display" of the genitals or pubic area of an individual.[64] They are:

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

> (2) whether the setting of the visual depiction is sexually suggestive, i.e. in a place or pose generally associated with sexual activity;

> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

> (4) whether the child is fully or partially clothed, or nude;

> (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.[65]

In addition to these six factors, several federal circuit courts have recognized that although *Dost* provides some specific, workable criteria, there may be other factors that are "equally if not more important in determining whether a photograph contains a lascivious exhibition."[66] CAAF has adopted the approach of these other courts to determine whether a particular photograph contains a "lascivious exhibition" by combining a review of the *Dost* factors with an overall consideration of the totality of the circumstances.[67]

In *United States v. Piolunek*, CAAF reasoned, "Properly instructed members are well suited to . . . determin[e] . . . whether an image does or does not

---

[63] 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987).

[64] *Roderick*, 62 M.J. at 429.

[65] *Id.* (quoting *Dost*, 636 F. Supp. at 832).

[66] *Id.* at 429-30 (quoting *United States v. Amirault*, 173 F.3d 28, 32 (1st Cir. 1999)).

[67] *Id.* at 430.

depict the genitals or pubic region, and is, or is not, a visual depiction of a minor engaging in sexually explicit conduct."[68] Thus, the *Piolunek* court held:

> convictions by general verdict for possession and receipt of visual depictions of a minor engaging in sexually explicit conduct on divers occasions by a properly instructed panel need not be set aside after the [Court of Criminal Appeals] decides several images considered by the members do not depict the genitals or pubic region.[69]

In *United States v. Blouin*, CAAF implied that there must be genital or pubic area nudity under a prosecution for child pornography under a "lascivious display" theory of child pornography.[70] Subsequently, in *United States v. Gould*, following a remand from CAAF to revisit its earlier opinion affirming the appellant's child pornography conviction in light of CAAF's *Blouin* opinion, our sister court considered whether four photographs of a minor female whose pubic area was covered by underwear met the definition of child pornography.[71] Although the *Gould* court did not answer the question of whether a lascivious exhibition requires actual nudity, it nonetheless applied the *Dost* factors and under the totality of the circumstances held that the images were legally and factually insufficient to support the child pornography offense.

It is an element of an Article 134 child pornography offense that the accused "knowingly and wrongfully" possessed, received, or viewed the child pornography in question.[72] "Any facts or circumstances that show that a visual depiction of child pornography was unintentionally or inadvertently acquired are relevant to wrongfulness, including but not limited to the method by which the visual depiction was acquired, the length of time the visual depiction was maintained, and whether the visual depiction was promptly, and in good faith, destroyed or reported to law enforcement."[73]

---

[68] 74 M.J. 107, 110 (C.A.A.F. 2015).

[69] *Id.* at 111-12.

[70] 74 M.J. 247, 250 (C.A.A.F. 2015).

[71] *United States v. Gould*, 2017 CCA LEXIS 338 (Army Ct. Crim. App. 2017) (unpublished).

[72] *MCM*, pt. IV, para. 68b.b.(1)(a) (2016 ed.).

[73] *MCM*, pt. IV, para. 68b.c.(9) (2016 ed.).

In *United States v. King*, CAAF recently considered the issue of legal sufficiency in a case where the appellant was convicted of viewing three images of child pornography.[74] All three of the images were found on the appellant's home computer, with two found in cache and the third in unallocated space.[75] The government's computer forensic expert testified among other things that there was no way to know if the appellant had actually accessed the cached images, and that there was no way of knowing from any forensic determination whether a user had actually seen the charged photos.[76] However, the expert did confirm that the appellant had searched for several terms indicative of child pornography.[77]

Despite there being no direct evidence of guilt, CAAF affirmed King's conviction based on the strong circumstantial case presented by the government. The court enunciated:

> We recognize that the ability to rely on circumstantial evidence is especially important in cases, such as here, where the offense is usually committed in private . . . . [D]irect evidence of the offense of viewing child pornography will be rare because the offense is usually committed in private. As a result the government often will have to rely on circumstantial evidence in attempting to prove the offense.[78]

Assessing the facts of King's case, CAAF further reasoned that although "the forensics failed to conclusively determine that [the appellant] actually saw the three charged images, they still give rise to an inference that [the appellant] viewed the photos."[79] Among the facts that the court relied upon to reach that conclusion were that the images of child pornography were found on his password-protected home computer, and that the forensic report suggested that at one time the two cached files were viewed.[80]

---

[74] 78 M.J. 218, 219 (C.A.A.F. 2019).

[75] *Id.* at 220.

[76] *Id.* at 220-21.

[77] *Id.* at 221.

[78] *Id.*

[79] *Id.* at 222.

[80] *Id.*

*2. Only one of the five images of which Appellant was convicted of receiving, viewing, and possessing is legally sufficient to meet the definition of "a minor engaging in sexually explicit conduct"*

The Government offered a total of five images [Pros. Ex. 5, Images 5a-5e] of alleged child pornography into evidence, under the theory that the images constituted visual depictions of a minor engaging in sexually explicit conduct because each constituted a "lascivious display" of Miss Johnson's genitals or pubic area. The military judge properly instructed the members with regard to all relevant provisions of the law. Subsequently, the members returned a general verdict to convict Appellant of a single specification of, on divers occasions, possessing, receiving and viewing "digital images of a minor, engaging in sexually explicit conduct."

Under the totality of the circumstances, we find that only Image 5a is legally and factually sufficient to meet the definition of "a minor engaging in sexually explicit conduct." We find the remaining images legally insufficient to meet this element of the offense.[81]

Image 5a depicts Miss Johnson engaging in sexually explicit conduct because the image constitutes a lascivious display of her pubic area. This image depicts her fully nude and lying on a bed. She has one arm up in the air, apparently holding her cell phone or other camera over her head to take the "selfie" picture. From this angle, her breasts are prominently displayed. Her legs are closed tightly, thus obscuring her genitals. However, her pubic area, to include pubic hair, is visible. Applying the *Dost* factors, we first find that, although her breasts are a focal point of the picture, her pubic area is a focal point as well.[82] Second, the image's setting is sexually suggestive because she is lying on a bed. Third, Miss Johnson appears in an unnatural pose because she is lying on her back, looking up at the camera and smiling at it. Fourth, she is fully nude in the photo. Fifth, the image depicts sexual coyness because of the way she is smiling. Sixth, we believe that the image is intended to elicit a sexual response under all of the circumstances.

---

[81] We abstain from reviewing Images 5b-5e for factual sufficiency because we have found those images legally insufficient. This is because we are required to "first . . . determine the correct, applicable law in this case in order to properly conduct [our] factual sufficiency analysis." *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016).

[82] We are unaware of any restriction under the relevant law that a photo can have only one focal point.

We find that none of Images 5b-5d are legally sufficient to meet the definition of sexually explicit conduct. In each of the photos, Miss Johnson is topless but wearing opaque underwear that covers her genitals and pubic area. In none of the photos is she engaging in any other activity that would constitute sexually explicit conduct. Although we are mindful that in *Blouin*, our superior court did not expressly hold that genital or pubic area nudity is required to meet the definition of "lascivious display," CAAF strongly implied it. Ultimately, even when viewing them in the light most favorable to the Prosecution, we simply are unable to conclude that a reasonable factfinder could have found these three images to meet the strict definition of child pornography.

Similarly, we find that Image 5e is legally insufficient to meet the definition of sexually explicit conduct. In this photo, Miss Johnson is standing in a shower fully nude, with her arm across her breasts. However, due to the angle of the camera and the shadow cast by her upper body, her genitals and pubic area are not visible. Because it is impossible to discern her genitals or pubic area in the picture, we readily find that a reasonable fact finder could not have found this image meets the strict definition of child pornography.

Even though we have decided that some of the images at issue do not depict the genitals or pubic region, because the members were properly instructed on the applicable law, under CAAF's holding in *Piolunek*, the general verdict on the specification at issue need not be set aside as a whole. However, the Government's "on divers occasions" charging scheme for this specification was based on the theory that on various occasions during the charged period, Miss Johnson sent Appellant an image or images of herself constituting child pornography, which Appellant thereafter knowingly and wrongfully received, viewed, and possessed. Therefore, as we have found that only one of the five charged images constitutes child pornography, in our decretal paragraph we will set aside and dismiss the words "on divers occasions" and "digital images" substituting therefor the words "a digital image."

*3. There is legally and factually sufficient evidence that Appellant knowingly and wrongfully received, viewed, and possessed child pornography*

Above, we find that Pros. Ex. 5, Image 5a constitutes child pornography. We now find that the evidence is legally and factually sufficient to conclude that Appellant knowingly and wrongfully received, viewed and possessed this image.

There is direct evidence that Appellant committed the child pornography offenses of which he was convicted. Miss Johnson testified she sent the charged images to Appellant after he sought out nude photos of her during

their conversations over video chat. She further testified that she knew he received and viewed them because each time she sent him a picture he would later tell her in video chat that he "liked what he saw in the picture, and he would like more."[83]

Appellant acknowledges that he admitted to law enforcement that he received and possessed, inadvertently, Image 5e, the picture of Miss Johnson in the shower. However, he also correctly points out on appeal that the image does not meet the strict definition of child pornography. He further argues that Miss Johnson's testimony is "simply inadequate" to prove knowing and wrongful receipt, viewing, and possession of child pornography,[84] and highlights that there is no direct evidence contained in any of the 44 pages of text messages between them introduced at trial that shows he knowingly and wrongfully received, viewed, or possessed them.

We are aware that Miss Johnson's testimony on a variety of topics was significantly impeached during cross-examination by the TDC. We acknowledge that during the investigation, Miss Johnson emailed an unsolicited nude picture to SA Williams. We also observe from the record that a Defense legal clerk impeached her testimony concerning whether she ever told TDC that she had sometimes sent Appellant unsolicited nude photos. Under these circumstances, we consider her testimony cautiously.

However, we find that Miss Johnson's testimony concerning Appellant's desire for and acknowledgment of receipt of nude images is corroborated by circumstantial evidence yielded by the forensic examination of Appellant's devices. The image at issue was found on Appellant's cell phone. Although it was in cache format, the Government's digital forensics expert testified that to appear in such a format a digital image would normally have been saved, such as in a cell phone's photo gallery.[85]

Additionally, there was evidence offered by the Government that may properly be considered for non-propensity purposes under Mil. R. Evid. 404(b), as additional circumstantial evidence on the issue of whether Appellant knowingly received, viewed, and possessed Image 5a. Specifically, we find that evidence that Appellant searched an adult pornography website

---

[83] R. at 795.

[84] Appellant's Br. at 37.

[85] We also acknowledge the testimony of the Defense forensic examination expert who testified that Facebook Messenger has a setting that allows a user to automatically save any photos sent to the user via that application.

for the term "Jamaican teen," as well as evidence that he asked Miss Johnson to masturbate for him over video chat is strong circumstantial proof that he knowingly received, possessed, and viewed the image at issue after she sent it to him.[86]

Evidence that Appellant was sexually interested in pornographic images of Jamaican teenagers, as demonstrated by the phrase "Jamaican teen" entered as a search term on a legal pornography site from his laptop during the charged period, corroborates Miss Johnson's testimony that he knowingly received and viewed nude pictures of her (a Jamaican immigrant teen), to include Image 5a. This evidence also reasonably supports the inference that he possessed Image 5a on his cell phone for some appreciable period of time.

Miss Johnson's testimony that Appellant repeatedly asked her to masturbate on camera for his sexual gratification is relevant for the same reasons. Her testimony on this point is strongly corroborated by the following text exchange between Appellant and her:

Appellant:     stop if it hurts

Miss Johnson:     I'm not doing anything

My cervix hurts since yesterday[87]

Relying on all of the direct and circumstantial evidence on this issue, and drawing all inferences in favor of the Prosecution, we find that a reasonable fact finder could have reached the conclusion that Appellant knowingly and wrongfully received, viewed, and possessed Image 5a.[88]

With regard to factual sufficiency, we have carefully reviewed the record of trial, the briefs of counsel, and have given no deference—other than to recognize that the finders of fact heard and saw the witnesses in person—to the factual determinations made at the trial level. Based on that review, we are convinced beyond a reasonable doubt that Appellant knowingly and wrongfully received, viewed, and possessed Image 5a.

---

[86] During his finding instructions, the military judge provided the members a proper instruction that they could use such evidence for this purpose.

[87] Pros. Ex. 8, at 26-27.

[88] *See King*, 78 M.J. at 222.

**D. Sentence Reassessment & Sentence Appropriateness**

*1. Sentence reassessment*

Having set aside certain language of which Appellant was found guilty in the sole Specification of Charge II, we must determine if we can reassess the sentence "more expeditiously, more intelligently, and more fairly than a new court-martial."[89] In reassessing sentences, we "act with broad discretion."[90]

So long as we are able to determine that the sentence imposed on Appellant, absent the error, would have been at least of a certain magnitude and no higher than he would have received without the error, we may reassess the sentence.[91] Any sentence we seek to affirm must be "appropriate," meaning it is not only "purged of prejudicial error [but] also . . . 'appropriate' for the offense involved."[92]

We look to the non-exclusive list of five factors in *Winckelmann* to determine whether to reassess a sentence or to order a sentencing rehearing: (1) whether there has been a dramatic change in the penalty landscape and exposure; (2) the forum of the court-martial; (3) whether the remaining offenses capture the gravamen of the criminal conduct; (4) whether significant aggravating circumstances remain admissible and relevant; and (5) whether the remaining offenses are the type with which we as appellate judges have experience and familiarity to reasonably determine what sentence would have been imposed at trial.[93]

Under all the circumstances presented, we find that we can reassess the sentence and it is appropriate for us to do so. There is no change in the penalty landscape and exposure. Appellant was sentenced by members. The remaining language and offenses capture the gravamen of the criminal conduct for which Appellant was sentenced, and there is little change in admissible sentencing evidence. Additionally, we have significant experience and familiarity with the language and offenses that remain and conclude that sentence reassessment is appropriate. Absent the error, we are confident that

---

[89] *United States v. Wincklemann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (internal quotation marks omitted).

[90] *Id.*

[91] *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

[92] *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

[93] *Winckelmann*, 73 M.J. at 15-16.

the court-martial would have imposed a sentence no less severe than that contained in the Entry of Judgment—eight months' confinement and a dishonorable discharge. Finally, we conclude the reassessed sentence purges the error from the original sentence and is an appropriate punishment for the modified findings and this offender.[94]

### 2. Sentence appropriateness

With regard to sentence appropriateness, Appellant argues that a dishonorable discharge is an inappropriately severe punishment in light of the nature of the misconduct. Among other things, Appellant asks us to consider that Miss Johnson was a 15-year-old high school student as opposed to a young child and that she was "the primary instigator of the relationship, including, judging from the text messages, its sexual nature."[95] He also asks us to take into consideration the fact that "the entire relationship was conducted behind the relative anonymity of the computer and phone and there was no physical contact."[96]

In making our determination, we take into account Appellant's brief but meritorious service and his personal circumstances at the time of the offenses. However, Appellant, a 25-year-old Marine, transformed his mentor-like relationship with a 15-year-old high school student interested in joining the Marine Corps into one that is fairly characterized as sexual abuse of an underage girl. Along the way, he encouraged her to masturbate with a glass bottle on multiple occasions during video chats for his own sexual gratification, causing her to experience physical pain on at least one of those occasions. He also knowingly and wrongfully received, viewed, and possessed an image of child pornography of her that she sent him. Moreover, Appellant knew that Miss Johnson had previously been the victim of abuse committed by members of her family. Considering all the circumstances, we determine Appellant's sentence as reassessed, to include his dishonorable discharge, to be appropriate.

## III. CONCLUSION

The finding of guilty to the words "on divers occasions" and "digital images" contained in the sole Specification of Charge II are **SET ASIDE**, and that

---

[94] *Sales*, 22 M.J. at 308.

[95] Appellant's Br. at 57-58.

[96] *Id.* at 58.

language is **DISMISSED WITH PREJUDICE**. The words, "a digital image," are substituted for the words, "digital images", so that the sole Specification of Charge II now reads:

> In that Private First Class Barnabas E. Pearson, U.S. Marine Corps, on active duty, did at or near Cherry Point, North Carolina, between on or about 1 August 2017 and on or about 31 October 2017, knowingly and wrongfully possess, receive, and view, child pornography, to wit: a digital image of a minor, engaging in sexually explicit conduct, and that said conduct was of a nature to bring discredit upon the armed forces.

After careful consideration of the record and briefs of the appellate counsel, we have determined that, following our corrective action, the remaining findings and the sentence contained in the Entry of Judgment are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights remains.[97] Accordingly, the findings as modified and the sentence are **AFFIRMED**.

Senior Judge STEPHENS and Judge DEERWESTER concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[97] UCMJ arts. 59, 66.